ROBERTO MELÉNDEZ PIÑERO y OTROS, demandantes y recurridos, *v.* LEVITT & SONS OF PUERTO RICO, INC., demandada y recurrente; COMMERCIAL INSURANCE COMPANY, tercera demandada y recurrida.

*Números:* RE-88-32 *Resueltos:* 13 de diciembre de 1991
RE-88-53

522

530

*Neftalí Cruz Pérez*, abogado de la recurrente; *Juan T. Peñagarícano, Jr.*, abogado de los recurridos; *Carlos Martínez Téxidor*, abogado de Comercial Insurance Company of Newark, tercera demandada y recurrida; *Vicente Santori Coll*, abogado de American Motorist Insurance Company, tercera demandada.

EL JUEZ ASOCIADO SEÑOR REBOLLO LÓPEZ emitió la opinión del Tribunal.

Levitt & Sons of Puerto Rico, Inc. (en adelante Levitt & Sons) subcontrató los servicios de Insular Construction Corp. para la construcción de la base estructural en hormigón de unidades residenciales a ser edificadas en la urbanización Levittown, sita la misma en el pueblo de Toa Baja, Puerto Rico. Como es común en el desarrollo de proyectos de construcción, mediante el contrato suscrito por ambas partes para la ejecución del trabajo, la subcontratista Insular Construction Corp. acordó gestionar y mantener en vigor un seguro de responsabilidad en protección de la constructora principal y dueña del proyecto, Levitt & Sons. En cumplimiento del contrato, Insular Construction Corp.

obtuvo un Seguro Comprensivo de Responsabilidad General (S.C.R.G.) de la Commercial Insurance Company of Newark (en adelante Commercial Insurance). La póliza de seguros a esos efectos expedida por Commercial contenía un "acuerdo general de cubierta", sujeta la misma a una serie de exclusiones.

Insular Construction Corp., conforme lo acordado, edificó la estructura base de hormigón reforzado que forma las paredes, losa de pisos y columnas de las residencias. La construcción llevada a cabo por Insular Construction Corp. se extendió por un período aproximado de cinco (5) años; esto es, de noviembre de 1969 al mes de junio de 1974. Otros subcontratistas de Levitt & Sons completaron las viviendas al instalar la plomería, electricidad, ventanas y puertas, empañetar las paredes y techos, fijar las cubiertas de los pisos y pintar las estructuras.

Cientos de residentes de Levittown instaron reclamaciones en daños contra Levitt & Sons, alegando la existencia de vicios y defectos de construcción en sus residencias. Levitt & Sons trajo al pleito, como tercera demandada, a Commercial Insurance. En la demanda contra tercero que a esos efectos radicara sostuvo: primero, que en las reclamaciones individuales radicadas en su contra, los residentes demandantes alegaban vicios y defectos de construcción en aquellas partes edificadas por Insular Construction Corp., y, segundo, que la póliza emitida por Commercial Insurance en favor de Insular Construction Corp. cubría las reclamaciones de los demandantes en la eventualidad de que éstos prevalecieran en el pleito. La compañía aseguradora negó cubierta y solicitó la desestimación sumaria de la demanda a base de las exclusiones de responsabilidad contenida en las cláusulas (l) y (m) de la póliza. Levitt & Sons se opuso. Ambas partes, mediante la presentación de escritos complementarios, argumentaron en torno a los riesgos y la extensión de la cubierta de la póliza emitida. El Tribunal Superior, Sala de Bayamón, acogió los plantea-

mientos de la aseguradora en sentencia que a esos efectos dictara el 22 de diciembre de 1987. En su consecuencia, "declar[ó] con lugar la sentencia sumaria solicitada por Commercial Insurance Company y desestim[ó] las demandas contra tercero radicadas por Levitt & Sons contra ella". *Exhibit* B, pág. 4.

Inconforme, Levitt & Sons acudió en revisión ante este Tribunal. En el recurso que a esos efectos radicara, le imputa al foro de instancia haber errado:

A. ... al desestimar totalmente la demanda contra tercero contra Commercial Insurance Company.

B. ... al determinar, mediante la desestimación total de la acción contra la tercera demandada, que esta no responde por los daños causados a la estructura total o producto final por el trabajo realizado por su asegurad[a].

C. ... al no considerar la contención de la recurrente en el sentido de que la parte [recurrida] estaba impedida por sus propios actos de negar cubierta. Solicitud de revisión, pág. 2.

Expedimos el auto de revisión radicado.[1] Estando en condiciones de resolver el mismo, procedemos a así hacerlo.

I

El Seguro Comprensivo de Responsabilidad General (S.C.R.G.) es una "póliza modelo" sobre responsabilidad civil desarrollada bajo el auspicio de varios organismos tarifadores de la industria norteamericana del seguro. Estas organizaciones, responsables de la promulgación de la póliza, agrupan como miembros y suscriptores a las com-

---

[1] Posteriormente —al ser informados por el Secretario del Tribunal Superior de Puerto Rico, Sala de Bayamón, que los autos del presente caso "constan de cuarenta y nueve (49) legajos ... lo[s] que ocupan por su volumen seis (6) gavetas de un [a]rchivo de [m]etal [de] tamaño legal" (Misiva de 15 de marzo de 1988, pág. 1)— le concedimos término a los recurrentes y recurridos para que nos informaran qué parte de los mismos era necesaria, a la luz de los errores imputados, para resolver adecuadamente el recurso. En vista de la posición expuesta por las partes, ordenamos que los autos fueran elevados en su totalidad. El examen minucioso y responsable de los mismos ha tomado un largo período de tiempo.

pañías de seguros más importantes dentro de los Estados Unidos. Nota, *Liability Coverage for "Damages Because of Property Damage" Under the Comprehensive General Liability Policy*, 68 (Núm. 4) Minn. L. Rev. 795, 798 (1984); Fish, *An Overview of the 1973 Comprehensive General Liability Insurance Policy and Products Liability Coverage*, 34 J. Mo. B. 257 (1978); G.H. Tinker, *Comprehensive General Liability Insurance—Perspective and Overview*, 25 (Núm. 3) Fed'n Ins. Couns. Q. 217, 218-219 (1975). La creación del S.C.R.G. en el 1940, junto a otros patrones fijos de pólizas, surgió en respuesta al *deseo de uniformar* la manera en que la industria aseguradora le proveía protección al consumidor contra distintos tipos de riesgos. La práctica anterior había generado mucha confusión. Cada asegurador redactaba y configuraba individualmente en las pólizas sus propias disposiciones y términos. La falta de uniformidad confundía al público consumidor. 7A *Appleman, Insurance Law and Practice* Sec. 4491 (1979).

Como resultado de la "estandarización", los términos y patrones adoptados por la industria se han convertido en cláusulas uniformes y modelos fijos, contenidos virtualmente en todas las pólizas que desde entonces se emiten. Nota, ante, pág. 798. Los beneficios obtenidos son diversos. En primer lugar, el asegurador y el asegurado, pueden determinar con mayor facilidad los riesgos cubiertos. J. Long y Gregg, *Property & Liability Insurance Handbook*, 58–59 (1965). En adición, y quizás más importante, las decisiones judiciales que interpretan las disposiciones uniformes de la póliza adquieren más significado y relevancia.

El modelo de la póliza que instrumenta el S.C.R.G. ha sido revisado periódicamente en un esfuerzo continuo por clarificar el riesgo que el asegurador asume bajo la misma. La industria aseguradora también ha querido atemperar la póliza a las interpretaciones de los

tribunales. La "póliza modelo" fue revisada originalmente en el año 1943, luego en el 1955, 1966, 1973 y, recientemente, en el año 1985. La cobertura del seguro, no empece, ha generado un cúmulo enorme de litigación, pues el S.C.R.G. es el seguro de responsabilidad más utilizado en el desarrollo de empresas comerciales. Debido a las revisiones en los términos y el lenguaje de la póliza, y debido a que una póliza en particular puede desviarse de los patrones adoptados comúnmente, *los casos que interpretan la cubierta del referido seguro no son autoridad persuasiva si no envuelven el mismo lenguaje o el mismo modelo de la póliza que se examina.* A esos efectos, véanse: Tinker, ante, pág. 219; *Hartford Acc. & Indem. v. Pacific Mut. Life Ins.*, 861 F.2d 250, 252 (10mo Cir. 1988); *Federated Mut. Ins. Co. v. Concrete Units*, 363 N.W.2d 751, 756 (1985).

No hay duda del hecho de que las pólizas de seguro que son vendidas en Puerto Rico son, de ordinario, las "pólizas modelos" de los distintos tipos de seguro que venden en los Estados Unidos las compañías aseguradoras. Ello hace que la jurisprudencia federal y estatal interpretativa de las mismas tengan una obvia utilidad y un gran valor persuasivo en nuestra jurisdicción.[2] No se debe olvidar, sin embargo, que nuestro ordenamiento codifica sustantivamente tanto el Contrato de Seguro, Arts. 11.010 y ss. del Código de Seguros, 26 L.P.R.A. secs. 1101–1137, como los principios básicos que rigen su interpretación, 26 L.P.R.A. sec. 1125 y Arts. 1233–1241 del Código Civil, 31 L.P.R.A. secs. 3471–3479.

## II

En relación con las pólizas que se emiten en el área específica del campo de seguro aquí en controversia,

---

[2] Al día de hoy, las revisiones del 1966 y 1973 continúan dominando la casuística relativa a la cubierta del seguro. Nota, *Liability Coverage for "Damages Because of Property Damage" Under the Comprehensive General Liability Policy*, 68 (Núm. 4) Minn. L. Rev. 795, 798 (1984).

existen dos estructuras básicas de cubierta. Una, tradicional, llamada "riesgo estipulado", y otra, que se aplica cada vez más y recibe el nombre de "a todo riesgo". El convenio sobre "riesgo estipulado", tal y como su nombre indica, ofrece una relación de los riesgos que cubre. Los que no se enumeran, por supuesto, no quedan cubiertos. El otro tipo, "a todo riesgo", declara la intención de cubrir todos los riesgos objeto del seguro, *excepto* los específicamente excluidos. Greene, *Risk & Insurance*, 4ta ed., Ohio, South-Western Publishing, 1977, págs. 191–192. *El S.C.R.G. es un ejemplo típico del seguro formulado sobre la base de "todo riesgo"*.

En este tipo de póliza el asegurador, en primer lugar, establece la cobertura de la póliza o seguro expedido mediante una cláusula, notoriamente amplia, denominada "acuerdo general de cubierta" (*coverage or insurance agreement*). El modelo moderno del S.C.R.G. contiene un "acuerdo general de cubierta" mediante el cual la compañía de seguros que la emite se compromete a pagar: "toda suma de dinero que el asegurado esté legalmente obligado a pagar por daños físicos o daños a la propiedad, a los que este seguro aplique, ocasionados por una ocurrencia ...". (Traducción nuestra y énfasis suprimido.) 2 *Long, The Law of Liability Insurance* Sec. 11A.100[1], pág. 11A-33 (1992). A renglón seguido, sin embargo, el asegurador limita el ámbito de su obligación, es decir, el ámbito de la cubierta, al proveer que "este seguro no aplica" a alrededor de diecisiete (17) "exclusiones" de responsabilidad que inmediatamente pasa a mencionar en orden alfabético. De modo que los riesgos que no se excluyen formalmente en la póliza, a través de las cláusulas de exclusión, son los riesgos que, paradójicamente, quedan incluidos como parte de la garantía del seguro. El valor o la extensión de la cobertura del S.C.R.G. se mide realmente, entonces, a base de cuáles riesgos permanecen garantizados después de determinarse cuáles son las exclusiones. 3A *Frumer y Friedman, Pro-*

*ducts Liability* Sec. 50.01B (1979); *Long*, ante, Secs. 11.01 y 11.09[1]. En su aplicación, cada exclusión reduce o circunscribe los límites verdaderos de la garantía amplia que concede el "acuerdo general de cubierta" de la póliza. Tinker, ante.

## III

En general, los contratos de seguros de responsabilidad civil tienen como fin primordial "garantiza[r] al asegurado contra la responsabilidad civil en que pueda incurrir ante terceros por actos de los que sea [legalmente] responsable". J. Castelo Matrán, *Diccionario Mapfre de Seguros*, Madrid, Editorial Mapfre, 1988, pág. 264. El asegurador se obliga, dentro de los límites establecidos en el contrato, a cubrir la obligación de indemnizar a un tercero por los daños y perjuicios causados por el asegurado. Como puede suponerse, sin embargo, en la práctica no existe un seguro que cobije toda la responsabilidad en que puede incurrir una persona. Lo que existe son seguros de responsabilidad civil que cubren determinadas actividades del asegurado, capaces de producir daños. Entre los más conocidos figuran, por ejemplo, el seguro de responsabilidad de automóviles (que versa sobre los daños que el uso de un vehículo de motor pueda causar a terceros) y los seguros de responsabilidad profesional concernientes a los perjuicios ocasionados a otros en el desempeño de una profesión: medicina, abogacía, arquitectura, etc.[3]

Dentro de este esquema de división por actividades, el S.C.R.G. constituye una de las formas principales de seguro *de responsabilidad comercial*. Mediante dicha póliza se pretende darle cubierta a las distintas fases o

---

[3] Greene, *Risk & Insurance*, 4ta ed., Ohio, South-Western Publishing, 1977, pág. 312, en el texto, clasifica los contratos de seguro de responsabilidad civil en cuatro (4) áreas: (1) responsabilidad comercial; (2) responsabilidad profesional; (3) responsabilidad personal, y (4) responsabilidad o seguro de automóviles.

aspectos de la realización de una actividad comercial por parte del asegurado.

El contrato modelo permite al asegurado protegerse de las reclamaciones en daños procedentes del uso de locales; de los procesos de fabricación, contratación u otras actividades del negocio; de la responsabilidad contingente, y de la responsabilidad por productos y operaciones terminadas. Greene, ante, págs. 317–323. Cada una de estas cubiertas podría obtenerse mediante pólizas separadas. Sin embargo, para un comerciante la utilidad del S.C.R.G. estriba en que la estructura de su cubierta logra combinar todas o algunas de ellas en un sólo contrato de seguro. De ahí, que la póliza sea conocida como un Seguro Comprensivo de Responsabilidad General.

En resumen, la póliza S.C.R.G. consiste en un formulario programado cuya redacción hace posible integrar varias clases de cobertura comercial. La póliza se emite a base de "todo riesgo"; esto es, la compañía de seguro que expide la misma viene en la obligación de responder por el asegurado si los hechos por los cuales se le reclama a éste no están excluidos específicamente en las exclusiones enumeradas en el contrato.

## IV

De las coberturas garantizadas en la póliza modelo nos interesa, en particular, la de responsabilidad por productos. La cubierta de responsabilidad civil por productos del S.C.R.G. asegura contra la posibilidad de que defectos en los bienes, productos o trabajos del asegurado ocasionen daños a la persona o propiedad de terceros. Es decir, el riesgo asegurado es la responsabilidad civil frente a terceros causada por defectos o fallas en el producto, labor o servicio del empresario asegurado.

Ahora bien, al estipular las condiciones de la

cubierta de responsabilidad por productos del S.C.R.G., la industria aseguradora estableció en la póliza una limitación, o exclusión, de cobertura basada en la noción de "riesgo de empresa" (*business risk*). El concepto "riesgo de empresa" vislumbra la posibilidad de que el fabricante de un producto ejecute de manera no competente su labor de manufactura, y se vea obligado, por lo tanto, a reemplazar o reparar el trabajo que ha realizado en forma defectuosa. En general, la cubierta sobre responsabilidad civil de productos del S.C.R.G. *no* garantiza este tipo de riesgo. P.A. Meyer, *Baybutt Construction Corp. v. Commercial Union Insurance Co: A Question of Ambiguity in Comprehensive General Liability Insurance Policies*, 36 (Núm. 1) Maine L. Rev. 179, 182 (1984); Tinker, ante, pág. 224; *Indiana Ins. Co. v. DeZutti*, 408 N.E.2d 1275 (1980). De modo que cuando la obra o el producto del asegurado es defectuosa, el asegurador no responde por los daños que, precisamente, haya sufrido *en sí misma* la labor o bien del asegurado. En adición, no responderá, *inter alia*, por los gastos que se incurran para subsanar el producto o rectificar sus defectos, ni tampoco por el costo de sustituir o retirar los bienes defectuosos por otros que operen correctamente.

En síntesis, todos los gastos relacionados con el reemplazo del producto u obra realizada por el fabricante o contratista, al igual que todos aquellos efectuados para remediar sus defectos, quedan excluidos de la cubierta del seguro. El empresario asegurado, como proveedor de bienes y servicios, puede estar legalmente obligado, al amparo del derecho de contratos, a garantizar el buen funcionamiento o la calidad de su trabajo o producto. Incluso podría estar obligado a su reemplazo total. La cubierta de la póliza S.C.R.G., sin embargo, no está diseñada para proteger contra esta responsabilidad. El S.C.R.G. no tiene como función asegurar la competencia técnica y/o calidad del producto de una empresa comercial. Tampoco asume el papel de una fianza de cumplimiento (*performan-*

*ce bond*), ni actúa como una garantía de servicios. *Allen v. Lawton and Moore Builders, Inc.*, 535 So. 2d 779 (1988). R.C. Henderson, *Insurance Protection for Products Liability and Completed Operations—What Every Lawyer Should Know,* 50 (Núm. 3) Neb. L. Rev. 415 (1971); *Long,* ante, Sec. 11.09[1]. La industria del seguro ha entendido que la empresa debe asumir una parte de los riesgos que crea, y el asegurador no debe cargar sistemáticamente con la impericia del fabricante. F. Chaumet, *Seguro de Responsabilidad Civil de Productos*, Madrid, Ed. Mapfre, 1979, pág. 7.

## V

La póliza S.C.R.G. emitida por Commercial Insurance a favor de la Insular Construction Corp. que interpretamos en el presente caso dispone, como "acuerdo general de cubierta", que:

> La compañía aseguradora pagará en beneficio de o por el asegurado toda suma de dinero que el asegurado esté legalmente obligado a pagar por:
> ... A. daños físicos o
> ... B. daños a la propiedad
> a los que este seguro aplique, ocasionados por una ocurrencia
> ....(Traducción nuestra y énfasis suprimido.) [4]

El lenguaje de esta cláusula corresponde fielmente al lenguaje adoptado por la industria del seguro luego de la revisión de la "póliza modelo" en el año 1973. En el mismo se bosqueja la póliza, a grandes rasgos, como un seguro de responsabilidad. En este contexto, y de acuerdo a los términos específicos de la transcrita cláusula,

---

[4] "The company will pay on behalf of the *insured* all sums which the *insured* shall become legally obligated to pay as damages because of:
"... A. *bodily injury*
"... B. *property damage*
to which this [insurance] applies, caused by *occurrence* ...." 2 *Long, The Law of Liability Insurance* Sec. 11A.100[1], pág. 11A-33 (1992).

Commercial Insurance se obligó a responder por los daños corporales (*bodily injur[ies]*) y/o por los daños a la propiedad de terceros (*property damage[s]*) que pudiese ocasionar Insular Construction Corp. al ejecutar su tarea de construcción en el proyecto residencial de Levittown.

Bajo el acápite de exclusión de riesgos, la póliza limitó la cobertura en daños esbozada por "el acuerdo general de cubierta" mediante la enumeración, entre otras, de las siguientes cláusulas de exclusión de responsabilidad:

> Este seguro no cubre:
>
> . . . . . . . .
>
> (l) Los daños que sufran los bienes o productos del asegurado, y que se originen de tales bienes o productos o de alguna de sus partes;
> (m) los daños que padezca la obra realizada por el asegurado, como consecuencia del trabajo que éste ha ejecutado, o de los materiales, partes o equipo que ha suministrado para su elaboración. (Traducción nuestra.)[5]

Respecto al significado de estas cláusulas no puede haber duda. Su lenguaje —que no es ambiguo, ni mucho menos obscuro— claramente informa: la póliza no cubre "los daños que sufran los bienes o productos del asegurado" ni "los daños que padezca la obra realizada por el asegurado [contratista] como consecuencia [de su] trabajo …". Alegato de la parte demandada recurrente, págs. 3–4. Véase *Biebel Bros., Inc. v. United States Fidelity & G. Co.*, 522 F.2d 1207 (8vo Cir. 1975).

---

[5]"This insurance does not apply:

. . . . . . . .

(l) [t]o property damage to the named insured's products arising out of such products or any [part] of such products;
(m) to property damage to work performed by or on 'behalf of the named insured arising out of the work o[r] any portion thereof, o[r] out of materials, parts or equipment furnished in connection therewith'." Alegato de la parte demandada recurrente, págs. 3–4.

En efecto, al introducir en el contrato estas cláusulas, Commercial Insurance excluyó formalmente de la cubierta de la póliza la noción del "riesgo de empresa" discutida anteriormente. En consonancia con el principio de que el S.C.R.G. no garantiza la calidad o buen funcionamiento de productos, la cláusula (1) conocida comúnmente como la "Exclusión de daños al producto" (*Injury to Products Exclusion*), tiene el propósito de evitar que el asegurador tenga que responder por la reparación o reemplazo de los bienes o productos elaborados de forma incorrecta o defectuosa por el fabricante asegurado. Por su parte, el inciso (m), denominado "Exclusión de daños al trabajo u obra realizada" (*Injury to Work Performed*), usualmente se considera en conjunto con la exclusión de "daños al producto", pues ambos siguen básicamente el mismo propósito. Como variante adicional, no obstante, la exclusión de "daños al trabajo u obra realizada" comprende la posibilidad de que los defectos en la obra ejecutada se deban, no sólo a la elaboración incorrecta, sino también al uso de materiales o partes defectuosas. Véase *Frumer y Friedman,* ante, Sec. 50.01B[1] y [2]; *Long,* ante, Sec. 11.09[2].

## VI

A la luz de las consideraciones y principios antes expuestos, es que tenemos que determinar si jurídicamente procedía desestimar la demanda de tercero radicada por Levitt & Sons en contra de la compañía aseguradora Commercial Insurance. Contestamos la pregunta en la negativa.

Para determinar la existencia de cubierta la distinción esencial es entre los defectos o vicios que sufra el producto o la obra realizada por el contratista asegurado, y, los daños que pueda experimentar, como consecuencia de esos vicios, cualquier otro bien o propiedad. Mientras que

el primer tipo de daño queda fuera de la cobertura de la póliza, el segundo no. Como vimos, en Levittown la asegurada Insular Construction Corp. edificó la base estructural de hormigón reforzado que forma las paredes, losa de pisos y columnas de cientos de residencias. Esta área o componente de las viviendas es, sin duda, la "obra o producto" de la empresa Insular Construction Corp. Al amparo de las cláusulas (l) y (m) de la póliza S.C.R.G. que adquirió, dicha subcontratista no obtuvo cubierta por los daños propios de su producto u obra, ya se manifestaren como resultado de algún defecto inherente en los mismos, ya como resultado de la manufactura impropia y/o utilización inadecuada de materiales por parte de la compañía. En consecuencia, los vicios y defectos de construcción de las residencias que realmente reflejen daños en las "armaduras" de hormigón reforzado fabricadas por la asegurada, no encuentran cubierta en la póliza.

Distinto, sin embargo, es el caso de los daños que puedan haber sufrido otros componentes de las residencias como *secuela o consecuencia* de los vicios en las armaduras. La plomería, el empañetado de las paredes, las cubiertas de piso, los gabinetes, puertas y ventanas de las residencias, *inter alia*, no son "productos" ni obra de Insular Construction Corp. Son el producto de otros subcontratistas de la constructora y dueña Levitt & Sons. Cualquier daño en ellas, atribuible a la obra de construcción realizada por Insular Construction Corp., sí está cubierto por el S.C.R.G. emitido por Commercial Insurance.

Erró, en su consecuencia, el tribunal de instancia al desestimar en su totalidad la demanda de tercero que contra la Commercial Insurance radicara la demandada recurrente Levitt & Sons. La mencionada compañía aseguradora debe permanecer en el pleito ante la posibilidad de que pueda tener que responder, de ello probarse adecuadamente, por los daños que los alegados vicios de construc-

ción en las armaduras de hormigón —que construyó su asegurada Insular Construction Corp.— puedan haber causado en otras partes o componentes de las viviendas construidas.

## VII

Procede que se señale, y se discuta, la curiosa e interesante contención de la recurrente Levitt & Sons a los efectos de que en virtud de la terminología de otra de las cláusulas de exclusión que contiene la póliza expedida por Commercial Insurance, ésta debe responder aún por los vicios de la propia obra realizada por su asegurada Insular Construction Corp. Su argumentación gira en torno a la cláusula de exclusión (a) que contiene la póliza en controversia en el presente caso. La misma establece que:

> Este seguro no cubre:
> (a) la responsabilidad asumida por el asegurado mediante algún contrato o acuerdo; esta exclusión, sin embargo, no aplica a la garantía sobre la calidad y buena condición del producto del asegurado ni la garantía de que el trabajo realizado por, o a nombre de éste, será rendido de una forma apropiada y en forma competente. (Traducción nuestra y énfasis suprimido.)[6]

El propósito de esta cláusula, conocida como la "Exclusión de la responsabilidad asumida por contrato" (*Contractual Assumed Liability Exclusion*), es limitar la cobertura del S.C.R.G. al campo de la responsabilidad civil extracontractual. 12 *Couch on Insurance 2d* Sec. 44A:36 (1981); *Haugan v. Home Indemnity Company*, 197 N.W.2d 18 (1972); *Vega v. Pepsi-Cola Bot. Co.*, 118 D.P.R. 661, 667

---

[6] This [insurance] does not apply ...:
"(a) to liability assumed by the *insured* under any contract or agreement ... but this exclusion does not apply to a warranty of fitness or quality of the *named insured's products* or a warranty that work performed by or on behalf of the *named insured* will be done in a workmanlike manner." (Énfasis en el original.) *Long*, ante, pág. 11A-33.

(1987). Levitt & Sons, no obstante, cita con énfasis la excepción a la exclusión que lee "esta exclusión, sin embargo, no afecta la garantía sobre la calidad y buena condición del producto del asegurado ni la garantía de que el trabajo realizado por [el asegurado] ... será rendido de una forma apropiada y en forma competente". (Traducción nuestra y énfasis suprimido.) *Long*, ante. Luego, la contrapone a las "exclusiones de daños al producto" y "daños al trabajo" contenida en las cláusulas (l) y (m) de la póliza, esto es, al acuerdo de que el seguro no indemniza los daños que padezcan "los bienes o productos del asegurado", ni los daños que padezca la obra realizada por éste. Al así hacerlo, plantea la controversia de si el lenguaje de la exclusión (a) es tan ambiguo, *vis-à-vis* las exclusiones (l) y (m), como para crear cubierta respecto a las obligaciones de garantía relacionadas con la posible manufactura defectuosa o impropia de la obra de construcción realizada por Insular Construction Corp. El planteamiento no es totalmente inmeritorio. En los Estados Unidos, una minoría de cinco (5) jurisdicciones estatales —Arizona, New Hampshire, North Dakota, Missouri y Colorado— han determinado que la póliza modelo S.C.R.G. es una ambigua y han dictaminado que, si la responsabilidad se basa en las garantías descritas, no aplican las exclusiones (l) y (m).[7] El efecto neto es que el asegurador no sólo responde por los daños ocasionados a la propiedad de terceros, sino también por los daños, defectos o vicios de *la obra misma* manufacturada por el asegurado.

En contraste, la mayoría de los tribunales han determinado que la excepción contenida en la exclusión (a) no invalida las exclusiones de "daños al producto" y "daños a

---

[7] *Federal Insurance Company v. P.A.T. Homes, Inc.*, 113 Ariz. 135, 139, 547 P.2d 1050 (Ariz. 1976); *Commercial Union Assur. Companies v. Gollan*, 118 N.H. 744, 748, 394 A.2d 839 (1978); *Aid Ins. Services, Inc. v. Geiger*, 294 N.W.2d 411, 414 (1980); *McRaven v. F-Stop Photo Labs, Inc.*, 660 S.W.2d 459, 462 (1983); *Worsham Const. Co. v. Reliance Ins. Co.*, 687 P.2d 988 (Colo. 1984).

la obra realizada" del S.C.R.G. Esta posición, asumida por la Corte de Apelaciones Federal para el Octavo Circuito (aplicando la ley de Missouri), y por los tribunales de los estados de California, New Jersey, Alaska, Tennessee, Florida, Indiana, Montana, New York, Virginia, West Virginia, Michigan, Hawaii, Illinois, Massachusetts, Washington y Maine, nos parece la más correcta.[8]

■ Levitt & Sons, en su empeño de que adoptemos la posición minoritaria, nos recuerda el criterio hermenéutico *contra preferentem* (interpretación en "contra del preferente" o redactor del contrato) que surge del Art. 1240 del Código Civil, 31 L.P.R.A. sec. 3478, a saber:

> La interpretación de las cláusulas obscuras de un contrato no deberá favorecer a la parte que hubiese ocasionado la obscuridad.

■ Desde *Barreras v. Santana*, 87 D.P.R. 227 (1963), hemos sostenido que "[l]a regla general antes mencionada preceptiva de que la obscuridad en la redacción de los contratos no deberá favorecer a la parte que la hubiese ocasionado, opera ... más rigurosamente en el caso de los contratos de seguro por ser ... contratos de adhesión". *Ba-*

---

[8] *Haugan v. Home Indem. Ins. Co.*, 86 S.D. 406, 413, 197 N.W.2d 18 (1972); *Biebel Bros., Inc. v. United States Fidelity & G. Co.*, 522 F.2d 1207, 1212 (8vo Cir. 1975); *St. Paul Fire & Marine Ins. Co. v. Coss*, 80 Cal. App. 3d 888, 896, 145 Cal. Rptr. 836 (1978); *Weedo v. Stone-E-Brick, Inc.*, 81 N.J. 233, 247, 405 A.2d 788 (1979); *U.S. Fire Ins. Co. v. Colver*, 600 P.2d 1, 3–4 (Alaska 1979); *Vernon Williams & Son v. Continental Ins. Co.*, 591 S.W.2d 760, 763–765 (1979); *LaMarche v. Shelby Mut. Ins. Co.*, 390 So. 2d 325, 326-327 (1980); *Indiana Ins. Co. v. DeZutti*, 408 N.E.2d 1275, 1278–1279 (1980); *Stillwater Condominium v. Am. Home Assur.*, 508 F. Supp. 1075, 1079 (D. Mont. 1981), confirmada 688 F.2d 848 (9no Cir. 1982), *cert.* denegado, 460 U.S. 1038 (1983); *Zandri Const. Co., Inc. v. Stanley H. CalKins, Inc.*, 81 A.D.2d 106, 109 (N.Y. App. Div.), confirmada 54 N.Y.2d 999, 430 N.E.2d 922, 446 N.Y.S2d 45 (1981); *Nationwide Mut. Ins. Co. v. Wenger*, 222 Va. 263, 267, 278 S.E.2d 874 (1981); *Helfeldt v. Robinson*, 290 S.E.2d 896, 901 (1981); *Fresard v. Michigan Millers Mut. Ins. Co.*, 327 N.W.2d 286 (1982); *Sturla, Inc. v. Fireman's Fund Ins. Co.*, 684 P.2d 960, 964 (Hawaii 1984); *Qualls v. Country Mut. Ins. Co.*, 123 Ill.App.3d 831, 834, 462 N.E.2d 1288 (1984); *Bond Bros., Inc. v. Robinson*, 471 N.E.2d 1332 (1984); *Harrison Plumbing & Heating v. N.H. Ins.*, 37 Wash. App. 621, 681 P.2d 875 (Wash. 1984); *Peerless Ins. Co. v. Brennon*, 564 A.2d 383 (1989).

*rreras v. Santana*, ante, pág. 232. La razón es sencilla. Los términos de un contrato de seguro no son producto de la negociación mutua entre las partes. Usualmente, tales términos están prefijados en un impreso preparado por las compañías aseguradoras y el asegurado se adhiere a los mismos si desea, pero no tiene la facultad de variarlos. Por ello, en los casos donde existe ambigüedad, las estipulaciones de las pólizas de seguro se interpretan vigorosamente en contra del asegurador, y liberalmente a favor del asegurado. *Casanova v. P.R.-Amer. Ins. Co.*, 106 D.P.R. 689 (1978); *Ferrer v. Lebrón García*, 103 D.P.R. 600 (1975); *Rivera v. Insurance Co. of P.R.*, 103 D.P.R. 91 (1974); *Pérez Escolar v. Collado*, 90 D.P.R. 806 (1964); *Barreras v. Santana*, ante. El asegurador, quien adopta o redacta las pólizas de seguro conforme a sus propios intereses sin la intervención directa del asegurado, tiene la obligación de hacer clara su intención; en otras palabras viene obligado a establecer en la póliza, de manera diáfana, los riesgos por los que viene obligado a responder. Ratificamos en el día de hoy la referida norma. Ello no obstante, nos negamos a adoptar la posición minoritaria antes mencionada; somos del criterio que la misma es incorrecta.

A nuestra manera de ver las cosas, la minoría de los tribunales que han encontrado cubierta para los "riesgos de empresa" a través de la excepción dispuesta en la exclusión (a) —o que, en la alternativa, han dictaminado ambigüedad entre las exclusiones (a), (l) y (m)— razonan bajo la premisa equivocada de que las "exclusiones de responsabilidad" pueden otorgar cobertura. Véase, *e.g., Applegren v. Milbank Mut. Ins. Co.*, 268 N.W.2d 114 (1978). Esta idea choca con el principio fundamental de que las "exclusiones de riesgos" reducen la cubierta de la póliza en lugar de expandirla o concederla. *Weedo v. Stone-E-Brick, Inc.*, 405 A.2d 788, 795 (1979). Hay que recordar que cada exclusión se lee en función del "acuerdo general de cubierta"

e independientemente de las restantes. Su lectura, por consiguiente, se hace *seriatim* y no de forma acumulativa. Si una exclusión aplica, no existe cubierta, a pesar de las inferencias o cualificaciones que puedan estar presentes en las demás. En fin, resulta incorrecto decir que una exclusión es inconsistente con otra, porque de acuerdo a la estructura de cubierta del S.C.R.G., éstas realmente no guardan relación entre sí. Tinker, ante, pág. 223; Weedo, ante, pág. 795; *Biebel Bros., Inc. v. United States Fidelity & G. Co.*, ante, pág. 1212.

En este sentido la exclusión de responsabilidad (a) no garantiza cobertura. Por el contrario, la cláusula limita y reduce el "acuerdo general de cubierta" de la póliza. La excepción a la exclusión, tan sólo remueve las garantías de calidad, buen funcionamiento y manufactura apropiada, de la exclusión relativa a la "responsabilidad asumida por contrato". Al aplicarse en función del "acuerdo general de cubierta" y junto a las exclusiones (l) y (m) del contrato, la excepción sencillamente provee que la póliza cubre los daños a la persona o propiedad de terceros ocasionados por algún defecto, vicio de calidad o por la manufactura inapropiada del producto u obra del asegurado. *Haugan v. Home Indemnity Company*, ante, pág. 22.

■ Es posible que todo este análisis sea muy técnico y refinado para "una persona normal de inteligencia promedio que fuese a comprar la póliza". *Barreras v. Santana*, ante, pág. 235. Somos del criterio, sin embargo, que Levitt & Sons no lee, ni interpreta, los términos de cubierta de un contrato S.C.R.G. como una persona particular promedio, sino, cuando menos, como un empresario promedio muy especializado y con vasta experiencia en la industria de la construcción. Hoy día, difícilmente una compañía de construcción familiarizada con el negocio de desarrollo de proyectos urbanos pueda pensar que al adquirir un seguro de responsabilidad realmente obtiene un seguro de propiedad,

una fianza de cumplimiento o una garantía de bienes y servicios.

## VIII

Mediante el segundo señalamiento de error, Levitt & Sons le imputa al foro de instancia haber errado al resolver que Commercial Insurance no responde, bajo la póliza que expidiera, "por los daños causados a la *estructura total o producto final* por el trabajo realizado por su asegurada". (Énfasis suplido.) Solicitud de revisión, pág. 7. A esos efectos nos señala que las armaduras de hormigón que construyó Insular Construction Corp. en Levittown —las paredes, el techo, el piso, las columnas de las viviendas— "no se puede[n] igualar ... con una residencia" completa. Señala que es imposible vivir en ellas, pues son "solamente uno de muchos integrantes que componen la totalidad de la estructura. [Su] costo estimado ... con relación al costo total de [cada residencia] ... es apena[s] un 35%". Íd. En resumen, Levitt & Sons señala que el producto de Insular Construction Corp. es realmente parte de otro "producto final" independiente de cada uno de sus componentes, la unidad de vivienda. Por lo tanto, argumenta, que cualquier defecto o vicio de construcción en la obra de la asegurada Insular Construction Corp. que haya afectado la vivienda como un "producto final" separado, está cubierto por la póliza S.C.R.G. emitida por Commercial Insurance. Así, sugiere como daño garantizado la disminución en valor de las residencias. No podemos estar de acuerdo. Veamos por qué.

El antes mencionado señalamiento hace necesario que bosquejemos la evolución que ha tenido en la industria del seguro el término "daños a la propiedad" que contiene la póliza S.C.R.G. en controversia en el presente caso como consecuencia de las decisiones judiciales emitidas a través de los años.

A pesar de los esfuerzos que la industria del seguro ha realizado por excluir de la cubierta del S.C.R.G. los "riesgos empresariales" de garantía —esto es, la indemnización o reemplazo del producto u obra defectuosa que no ocasiona otros daños— los tribunales, en un comienzo, extendieron la cubierta del seguro en los casos donde el producto o trabajo defectuoso del asegurado *se integraba a otros bienes o labores para formar una unidad o "producto final"*. Esto a base de la definición de "daños a la propiedad" del contrato. En el primer caso normativo en esta área, *Hauenstein v. Saint Paul-Mercury Indem. Co.*, 65 N.W.2d 122 (1954), el Tribunal Supremo de Minnesota concluyó que la póliza de responsabilidad de un distribuidor de la mezcla de cal y arena utilizada para obras de albañilería, garantizaba cubierta ante una reclamación de la garantía del producto. La mezcla se cuarteó luego de emplearse para la construcción de un hospital. El citado tribunal concluyó que el reclamo de la parte involucrada satisfizo el requisito de "daños o destrucción de propiedad" debido a que la presencia de la mezcla defectuosa redujo el valor del edificio. *Hauenstein v. Saint Paul-Mercury Indem. Co.*, ante, fue inmediatamente citado por otros tribunales con aprobación. Véase, *e.g., Geddes & Smith, Inc. v. Saint Paul-Mercury Indem. Co.*, 334 P.2d 881 (Cal. 1959); *Dakota Block Co. v. Western Casualty & Surety Co.*, 132 N.W.2d 826 (1965).

Posteriormente la revisión de la póliza modelo en 1966 añadió como requisito la existencia de "daño o destrucción de propiedad *tangible*", posiblemente bajo la apreciación de que las disminuciones en valor ocasionadas a una estructura, por la incorporación de un producto defectuoso, eran realmente pérdidas intangibles. Bowers, *General Liability Insurance Coverage for Defective Materials and Workmanship*, en B.C. Hart, *Construction Litigation* 181 (1979). La adición de la palabra "tangible", sin embargo, no tuvo efectos en las decisiones judiciales. El Tribunal Supremo de

Nevada, a manera de ejemplo, determinó que, bajo la póliza modelo de 1966, los gastos incurridos para cimentar una estructura debilitada por el uso del concreto defectuoso de la asegurada constituían "daño a la propiedad". El Tribunal citó a *Hauenstein v. Saint Paul-Mercury Indem. Co.*, ante, y su progenie pero no se pronunció en cuanto al efecto de los cambios en la definición de "daños a la propiedad".

La revisión de la póliza modelo en 1973 intentó otra vez revertir la tendencia jurisprudencial, que comenzó *Hauenstein v. Saint Paul-Mercury Indem. Co.*, ante, al incorporar a la definición de la póliza otro elemento: "daños *físicos* o destrucción de propiedad tangible." Este último cambio ha logrado en algunas jurisdicciones estatales el resultado previsto. En *Wyoming Sawmills v. Transportation Ins. Co.*, 578 P.2d 1253 (Or. 1978), el Tribunal Supremo de Oregon distinguió la línea de casos fundamentada en *Hauenstein v. Saint Paul-Mercury Idem. Co.*, ante, según fue decidida antes de que la definición de daños a la propiedad exigiese "daños físicos ... [a] propiedad tangible". El referido tribunal expresó: "la inclusión de la palabra [físicos] invalida toda posibilidad de que la póliza esté diseñada para incluir daños consecuenciales o intangibles', tales como depreciación en valor, dentro del término 'daños a la propiedad'." (Traducción nuestra.) *Wyoming Sawmills v. Transportation Ins. Co.*, ante, pág. 1256. Véase, en adición, *St. Paul Fire & Marine Ins. Co. v. Coss*, 145 Cal. Rptr. 836 (1978). Si la definición de "daños a la propiedad" *bajo la póliza modelo de 1966* —"daño o destrucción de propiedad tangible"— permite sostener la "cobertura de reducción en valor", *quaere*.[9]

---

[9] Existe la "posibilidad jurídica" de que la palabra *daño, sin más modificaciones*, pueda interpretarse de forma tal que incluya tanto daño físico como daño no-físico. Igualmente cabe el argumento de que la reducción en valor de propiedad tangible constituye un daño o lesión a cualquier propiedad, y, en consecuencia, cumple con el requisito de "daño o destrucción de propiedad tangible" exigido por la

*La definición de 1973, sin embargo, impone un resultado distinto.* La póliza modelo de 1973 define el término "daños a la propiedad" como *"daños físicos* o destrucción de propiedad tangible" *(the physical injury to or destruction of tangible property)*; definición contenida en la póliza modelo de 1973 a base de la cual las partes argumentaron y sometieron —y el tribunal de instancia resolvió— la solicitud de sentencia sumaria radicada por Commercial Insurance. De entrada hay que reconocer que, debido a que la póliza no define por separado el término "daño físico", sería posible concluir que las disminuciones en valor de las residencias están cubiertas si las considerásemos "daños físicos". Aunque algunos casos se han referido a las disminuciones en valor de una forma tan laxa, esta caracterización nos parece impropia. *E.g. McCollum v. Insurance Co. of North America*, 644 P.2d 283, 285 (Ariz. 1982); *Aetna Insurance Company v. State Motors Inc.*, 244 A.2d 64, 66–67 (1968).

Somos del criterio que el significado común, ordinario y popular de la frase "daño físico", contempla una lesión material, sustantiva y objetivamente perceptible. *Morales Garay v. Roldán Coss*, 110 D.P.R. 701 (1981). La disminución en valor de la propiedad tangible es realmente una lesión o daño de naturaleza incorpórea e intangible, y no un perjuicio en la sustancia material de la propiedad. Más aún, interpretar que la frase "daño físico" comprende una disminución en valor haría inexistente e inoperante la palabra *física* de la definición de "daños a la propiedad". *Wyoming Sawmills v. Transportation Ins. Co.*, ante, pág. 1256.

## IX

Mediante el último señalamiento de error Levitt & Sons hace un esfuerzo final por lograr que extendamos la cu-

---

definición de "daños a la propiedad" de 1966.

bierta de la póliza en controversia para incluir los daños o defectos de construcción en la obra realizada por Insular Construction Corp. A esos efectos, sostiene que el foro de instancia erró al desestimar su señalamiento de que la parte recurrida "estaba impedida por sus propios actos de negar cubierta". Solicitud de revisión, págs. 12–13. Examinemos dicho planteamiento.

Luego de que Insular Construction Corp. gestionara el S.C.R.G. que hoy interpretamos, la compañía de seguros Commercial Insurance envió a Levitt & Sons el siguiente certificado de seguro:

*Certificado de Seguro de Responsabilidad Pública*
*a favor de*
*Levitt & Sons*

La póliza, sujeta a sus términos, cubre la responsabilidad que la asegurada asuma mediante contrato con la Compañía para la cual se emite este certificado; específicamente: La contratista acuerda indemnizar y liberar de responsabilidad a la Compañía por todas las pérdidas, daños o gastos incurridos o reclamados debido a cualquier acto u omisión de la contratista, sus agentes o empleados. (Traducción nuestra.)[10]

El certificado *parece* hacer referencia al "acuerdo de liberación de responsabilidad" (*hold harmless agreement*) que la asegurada Insular Construction Corp. suscribió a favor de Levitt & Sons en el contrato pactado para la edificación de los armazones del hormigón. La cláusula 13 de dicho contrato expresa:

13. *Responsabilidad del Contratista por Daños*
La Contratista asume y libera al Dueño de la responsabilidad incurrida a causa de sus operaciones, o debido a sus actos u

---

[10] *"Public Liability Certificate of Insurance*
*for*
*Levitt & Sons*

"Policy, subject to its terms, covers liability assumed by assured in contract with the Company to whom this certificate is issued; specifically: 'The Contractor agrees to indemnify and save the Company harmless from all loss, damage, liability or expenses incurred or claimed by reason of any act or omission of the Contractor, his agents, servants and employees.' " *Exhibit* G, pág. A.

omisiones, o a la de sus empleados, agentes o asociados, ... incluyendo, pero sin limitarse a, cualquier responsabilidad, pérdida incurrida por razón de lesiones, muerte o daños a personas o propiedad. (Traducción nuestra.)([11])

Fundado en ello, Levitt & Sons alega que Commercial Insurance conocía el "acuerdo de liberación de responsabilidad", y que a través de los términos del certificado de seguro le hizo creer que la póliza emitida cubriría las circunstancias previstas en el mismo, entiéndase la compensación por los posibles vicios en las armaduras. Alega que "[d]escansando en dicha representación, Levitt no tuvo necesidad de exigirle a su contratista Insular, que gestionara el seguro correspondiente para respaldar [*in toto*] la cláusula de [liberación] contenida en el referido contrato [de construcción] ...". Alegato de la parte demandada, pág. 16. Por ello, sostiene la recurrente que Commercial Insurance no puede ir en contra de sus propios actos y negarse a indemnizar estos daños invocando ahora las cláusulas de exclusión (l) y (m) de la póliza.

 Las "dificultades" con esta posición son dos. Primero, en esta jurisdicción los certificados de seguro no son parte del contrato de seguro y, por lo general, un certificado tampoco puede variar los términos de una póliza. El Art. 11.250 del Código de Seguros de Puerto Rico, 26 L.P.R.A. sec. 1125, establece que los contratos de seguro se interpretan "a base ... de sus términos y condiciones ... según se hayan ampliado, extendido o modificado por aditamento, endoso o solicitud adherido a la póliza y que forme parte de ésta". De hecho, a tenor con el Art. 11.180 del mismo cuerpo de leyes, 26 L.P.R.A. sec. 1118, la póliza

---

([11]) "13. *Contractor's Liability for Damages*

"The Contractor assumes and shall hold the Owner harmless from any liability, loss, or expense incurred because of his operations hereunder, or any act or omission by him, his employees, agents or associates in connection with or during such operations, including, but without limitation to, any liability, loss, or expense incurred by reason of injury death or damages to or of persons of property." *Exhibit* G, pág. A.

deberá contener todo el contrato y "[n]ingún convenio que esté en conflicto con el contrato de seguro o que lo enmiende o amplíe será válido a menos que fuere por escrito y se hiciere formar parte de la póliza".

En este caso, el certificado de seguro no se adhirió ni se hizo formar parte de la póliza. Su expedición tenía el *único propósito* de notificar a Levitt & Sons que —en cumplimiento del contrato suscrito para la construcción de las estructuras de hormigón en Levittown— Insular Construction Corp. había adquirido un seguro de responsabilidad para su protección. En segundo lugar, el propio lenguaje del certificado de seguros *expresamente declara* que el mismo no varía las condiciones de la póliza: "La póliza, *sujeta a sus términos* ...." (Traducción nuestra y énfasis suplido.) *Exhibit* G, pág. A.

En adición, no podemos perder de perspectiva que para que sea de aplicación la doctrina de los actos propios en nuestra jurisdicción, es necesario: (a) una conducta determinada de un sujeto, (b) que haya engendrado una situación contraria a la realidad, esto es, aparente y, mediante tal apariencia, susceptible de influir en la conducta de los demás, y (c) que sea base de la confianza de otra parte que haya procedido de buena fe y que, por ello, haya obrado de una manera que le causaría un perjuicio si su confianza quedara defraudada. *Int. General Electric v. Concrete Builders*, 104 D.P.R. 871, 878 (1976). Esa no es la situación en el presente caso.

A tono con lo anteriormente expuesto, y en vista de la situación de hechos específica ante nuestra consideración, resulta difícil concebir que Levitt & Sons haya descansado en el escueto lenguaje del certificado de seguros citado previamente para confiar, de buena fe, en que la póliza suscrita entre Insular Construction Corp. y Commercial Insurance cubría todas las condiciones y expectativas que hoy alega. Del propio lenguaje del certificado de

seguro —que Levitt & Sons cita en apoyo de su contención— se desprende que la póliza expedida estaba sujeta a sus propios términos y condiciones, por lo que realmente no podemos aceptar que la notificación en controversia haya influido en la conducta de Levitt & Sons hasta el punto de hacerle creer, razonablemente, que los daños en la obra realizada por Insular Construction Corp., excluidos expresamente por las cláusulas (1) y (m) de la póliza, estaban plenamente cubiertos por el seguro. Pretender ignorar todos los términos y condiciones contenidos en el contrato de seguros en pos de una cubierta prácticamente sin restricciones en virtud del lenguaje del certificado de seguros, resulta no sólo difícil sino imposible de reconocer.

## X

*Se revoca la sentencia recurrida.* Por los fundamentos expresados en la parte VI de la presente Opinión, *resolvemos que no procede la desestimación sumaria de la demanda de tercero radicada en contra de la aseguradora Commercial Insurance Company of Newark, devolviéndose el caso al tribunal de instancia para la continuación de procedimientos ulteriores consistentes con lo aquí resuelto. Se dictará sentencia de conformidad.*

El Juez Presidente Señor Pons Núñez y el Juez Asociado Señor Negrón García se inhibieron.