Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL II

| SERVICIOS RADIOLÓGICOS Y ASOCIADOS, INC.<br><br>Apelantes<br><br>v.<br><br>UNIVERSAL INSURANCE COMPANY<br><br>Apelado | KLAN202400209 | *APELACIÓN* procedente del Tribunal de Primera Instancia, Sala Superior de San Juan<br><br>Caso número: SJ2019CV09656<br><br>Sobre: Incumplimiento Aseguradoras Huracanes Irma/María |

Panel integrado por su presidente, el juez Bermúdez Torres, el juez Adames Soto y la juez Aldebol Mora.

Aldebol Mora, Juez Ponente

# SENTENCIA

En San Juan, Puerto Rico, a 13 de mayo de 2024.

Comparece la parte apelante, Servicios Radiológicos y Asociados, Inc., mediante el recurso de epígrafe, y nos solicita la revocación de la Sentencia Parcial emitida por el Tribunal de Primera Instancia, Sala Superior de San Juan, el 12 de enero de 2024, notificada ese mismo día. Mediante dicho dictamen, el foro primario declaró Ha Lugar una solicitud de sentencia sumaria parcial promovida por Universal Insurance Company. En su consecuencia, ordenó a Universal Insurance Company a pagar la cantidad reclamada por las pérdidas de equipo médico para las localidades de San Juan, CFSE Fajardo y Humacao, descontando la cantidad reclamada por el MRI de la localidad de Carolina, y aplicando cualquier deducible o descuento que proceda conforme a los términos de la póliza.

Por los fundamentos que expondremos a continuación, se confirma la determinación apelada. Veamos.

I

El 17 de septiembre de 2019, Servicios Radiológicos y Asociados Inc (SRAI o apelante) presentó una *Demanda* por incumplimiento de

Número Identificador

SEN2024 _____

contrato, daños y perjuicios contractuales, mala fe, dolo y daños punitivos en contra de Universal Insurance Company (Universal o apelado).[1] Posteriormente, el 20 de septiembre de 2019, SRAI presentó una *Demanda Enmendada* en la que solicitó: (1) Declarar Ha Lugar la acción de incumplimiento de contrato y daños y perjuicios; (2) Condenar a Universal y a las otras partes demandadas al cumplimiento específico de lo pactado bajo la póliza, y a validar la cubierta de esta; (3) Condenar a Universal al pago de una cantidad no menor de cuatrocientos sesenta y seis mil cuatrocientos cincuenta y dos dólares ($466,452.00), por la pérdida de equipo médico, en costo de reparación; (4) Condenar a Universal al pago de la suma adicional de un millón ciento ochenta y tres mil doscientos dólares ($1,183,200.00), por la pérdida de ingresos hasta el 30 de septiembre de 2019, daños que alegaron aumentaban mensualmente a razón de cincuenta y tres mil cuatrocientos sesenta y siete dólares ($53,467.00) en pérdida adicional; (5) Imponerle a Universal el pago de una suma adicional no menor de cincuenta mil dólares ($50,000.00) por los gastos de peritos, investigadores y abogados para atender la negativa de Universal de honrar sus obligaciones bajo la Póliza; (6) Condenar a Universal al pago de cualquier suma adicional incurrida por la demandante en el proceso de defender su reclamación; (7) Determinar que Universal y otras partes demandadas habían sido temerarias, contumaz, y habían obrado de mala fe; (8) Que se le permitiera exceder de los límites de la Póliza, en aquellas reclamaciones que tuviesen algún límite, por la conducta temeraria, dolo y mala fe de Universal; (9) Condenar a Universal y a las otras partes demandadas al pago de la suma por concepto de costas, gastos y honorarios de abogado incurridos por la parte demandante en la tramitación del pleito, en una suma no menor de cincuenta mil dólares ($50,000.00); (10) Condenar a Universal y a otras partes demandadas al pago de la disminución en venta que tuvo el efecto de disminuir el valor en el mercado de la Oficina de Carolina de un millón seiscientos sesenta y

---

[1] Apéndice I del recurso, págs. 1-12.

cinco mil ochocientos diecinueve dólares ($1,665,819.00); (11) Condenar a Universal y a las otras partes demandadas al pago de daños previsibles y no previsibles y al 100% de los daños punitivos por su patrón de violaciones al estatuto de prácticas desleales de ajuste y aumentara al doble la cuantía de los daños reclamados; y, (12) Conceder cualquier otro remedio que se justificara a la luz de las alegaciones, la Póliza, el derecho y/o equidad.[2]

En respuesta, el 17 de enero de 2020, Universal presentó su *Contestación a Demanda Enmendada.*[3] En la misma, solicitó que se declarara No Ha Lugar la Demanda incoada por SRAI. De igual forma, entre sus defensas afirmativas estableció que Universal había cumplido con todas las obligaciones impuestas por el Código de Seguros y el contrato entre las partes.

El 5 de junio de 2020, Universal *presentó una Moción de Desestimación por Incumplimiento con el Artículo 27.164 del Código de Seguros.* En la misma, solicitó que se desestimara la *Demanda* en contra de Universal en su totalidad o en cuanto requiera algún remedio civil por incumplimiento con el Código de Seguros o alegadas prácticas desleales en el ajuste de la reclamación.[4]

En respuesta, el 6 de julio de 2020, SRAI presentó una *Moción en Oposición a la Solicitud de Desestimación Presentada por Universal Insurance Company.*[5] En síntesis, arguyó que la desestimación no procedía ya que se habían agotado todos los remedios administrativos y Universal no había hecho nada para remediar o curar los daños. Estableció que los daños alegados eran una secuela de una larga práctica desleal de "negar por negar" y que, la solicitud de desestimación presentada configuraba un largo patrón de mala fe a las que se le unían dos cartas negando cubierta por razones distintas. Por lo tanto, SRAI entendía que los daños alegados eran previsibles y continuaban sumándose diariamente. Asimismo, esbozó que Universal tuvo la oportunidad de cumplir con el Código de Seguros y

---

[2] Apéndice II del recurso, págs. 13-24.
[3] Apéndice III del recurso, págs. 25-47.
[4] Apéndice X del recurso, págs. 109-128.
[5] Apéndice XI del recurso, págs. 129-133.

no lo hizo, por lo tanto, procedía la acción en daños. Por todo lo antes expuesto, solicitó que se declarara No Ha Lugar la moción de desestimación presentada por Universal.

El 27 de julio de 2020, Universal presentó una Réplica a *Oposición sobre Moción de Desestimación por Incumplimiento con el Artículo 27.164 del Código de Seguros.*[6] En el recurso, arguyó que el foro primario no tenía jurisdicción para atender el reclamo de remedio civil en daños por alegadas prácticas desleales. En respuesta, el 31 de julio de 2020, SRAI presentó una *Dúplica a Réplica en Oposición a la Solicitud de Desestimación Presentada por Universal Insurance Company.*[7] En la misma, reiteró que la aseguradora se exponía a remedios civiles no contemplados en el contrato de seguros por su propia inacción.

Luego de evaluar las posturas de las partes, el 28 de agosto de 2020, notificada ese mismo día, el Tribunal de Primera Instancia emitió una *Sentencia Parcial.*[8] En la misma, declaró Ha Lugar parcialmente la moción de desestimación presentada por Universal, y decretó que los reclamos al amparo de los Artículos 27.164 y 27.165 vigentes del Código de Seguros no debían atenderse en ese momento. No obstante, estableció que los mismos se desestimaban sin perjuicio de que, luego de culminar el trámite en el foro administrativo, pudiesen traerse nuevamente al tribunal en un caso separado. Finalmente, el foro primario esbozó que el tribunal tenía jurisdicción sobre la materia para atender las demás causas de acción y, por lo tanto, procedía continuar con el restante de la reclamación.

Luego de varias instancias procesales, el 17 de noviembre de 2023, Universal presentó ante el foro primario una *Moción de Sentencia Sumaria Parcial.*[9] En síntesis, solicitó que se emitiera una sentencia sumaria parcial a su favor en cuanto a las siguientes reclamaciones de SRAI: (A) Por la pérdida del equipo de MRI de la oficina de Carolina. Sobre este equipo, establecieron que no tenía cubierta para daños a la propiedad causados

---

[6] Apéndice XII del recurso, págs.135-140.
[7] Apéndice XIII del recurso, págs.141-145.
[8] Apéndice XIV del recurso, págs.146-156.
[9] Apéndice XXVIII del recurso, págs.425-463.

por fluctuaciones de voltaje, tanto bajo la sección *Commercial Inland Marine* de la póliza como bajo la sección Commercial Property. Se alegó que la forma de *Physicians and Surgeons* de la cubierta Inland Marine excluía cualquier daño causado por fluctuaciones de energía eléctrica, por lo cual no había cubierta. De igual forma, estableció que no había cubierta para ese equipo bajo la cubierta de Commercial Property, ya que, a pesar de que la forma *Equipment Breakdown Coverage* cubre riesgos de fluctuaciones de voltaje, el local de Carolina no figura entre los locales a los que se extiende dicha cubierta; (B) Por las pérdidas relacionadas a la falta de uso del MRI de Carolina -i.e. pérdida de ingresos de $183,200.00 y reducción de $1,665,819.00 del valor del negocio. Sobre este particular, alegaron que: (1) Universal pagó el límite de responsabilidad de la póliza bajo la cubierta de interrupción de negocio durante la reclamación ($500,000); (2) En la medida en que se trataba de una pérdida relacionada y/o a consecuencia de no poder usar el equipo de MRI localizado en Carolina, la póliza no proveía cubierta para la pérdida en cuestión dado a que estaba excluida de las cubiertas de propiedad con cubierta de *Business Income*; (3) No aplicaban las doctrinas de equidad que tuviesen el efecto de extender la cubierta de la póliza, como tampoco procedería aplicar lo resuelto en los casos de *Morales v. Automatic Vending Service*, 103 DPR 281 (1975), ni *Carpets & Rugs v. Tropical Reps*, 175 DPR 615 (2009), a este caso porque no concurren aquí los mismos elementos de hecho que dieron lugar a esas decisiones; (4) La alegada reducción en el valor de la oficina de Carolina no era una pérdida real que pudiera ser compensable por la póliza, porque no había ocurrido y, en consecuencia, era contraria al principio de indemnización que rige a todo contrato de seguro.

El 18 de noviembre de 2023, SRAI presentó una *Moción de Sentencia Sumaria Parcial Declarando Ha Lugar la Responsabilidad Contractual de Pagar los Equipos Afectados y Ordenando el Pago de Partidas que Están Fuera de Disputa*.[10] En la misma, solicitó que se dictara

---

[10] Apéndice XXIX del recurso, págs. 808-821.

sentencia parcial a su favor ordenando el pago inmediato de los daños estimados por el perito de Universal, ascendentes a $422,158.27. De igual forma, solicitó que se dejara el diferencial de daños sobre costo de reemplazo y arreglo a la máquina que no se revisó por Universal, la pérdida de ingreso y la pérdida de valor de negocio, ambas por el incumplimiento contractual de esta para la vista en su fondo.

A su vez, 7 de diciembre de 2023, SRAI presentó una *Oposición a Moción de Sentencia Sumaria Parcial Presentada por Universal Insurance Company.*[11] En la misma, solicitó que se declarara No Ha Lugar la moción de sentencia sumaria parcial presentada por Universal y que declarara Ha Lugar la moción de sentencia sumaria presentada por ellos.

El 13 de diciembre de 2023, Universal presentó una *Oposición a "Moción de Sentencia Sumaria Parcial" presentada por la parte demandante.*[12] En la misma, solicitó que se declarara No Ha Lugar la solicitud de sentencia sumaria parcial de SRAI en lo concerniente a la localidad de Carolina, y que se declarara académica en lo relacionado a las localidades de San Juan, Humacao y Fajardo. Arguyó nuevamente que SRAI pretendía incluir en el pago solicitado los daños que había cuantificado el perito de Universal en cuanto al MRI de Carolina, pero que esos daños no estaban incluidos en la póliza.

Evaluadas las posturas de las partes, el 12 de enero de 2024, notificada ese mismo día, el Tribunal de Primera Instancia emitió la *Sentencia Parcial* que nos ocupa. El foro *a quo* desglosó las siguientes determinaciones de hechos incontrovertidos:

1. Servicios Radiológicos Asociados ("SRA") es una empresa puertorriqueña de proveedores de servicios radiológicos.

2. SRA, al momento del paso del huracán María por Puerto Rico y durante el periodo de esta reclamación, es una Sociedad de Responsabilidad Limitada debidamente inscrita, registrada y activa en el Departamento de Estado de Puerto Rico con Número de Registro 259, que hace negocios como "SERVICIOS RADIOLÓGICOS ASOCIADOS", y es una empresa de proveedores de servicios radiológicos que mantiene en sus facilidades varios equipos de diagnóstico por imagen y resonancia magnética entre los cuales se encuentran equipos de MRI, Tomografía Computarizada (CT), y Ultrasonido, entre otros.

---

[11] Apéndice XXXII del recurso, págs. 1201-1227.
[12] Apéndice XXXIII del recurso, págs. 1228-1276.

3. A la fecha del Huracán María, los socios de SRAI eran los doctores Francisco Vargas Soto, Jorge Pérez Bras y Ricardo Castro Ramírez.

4. Universal Insurance Company ("Universal") es una compañía de seguros debidamente autorizada por el Comisionado de Seguros para asegurar riesgos en Puerto Rico.

5. SRA y Universal suscribieron un contrato de seguro por conducto de su agente autorizado, Javier Calderón, tipo Póliza Comercial número 09-560-000549716-1/000 expedida por Universal, con sus respectivos endosos y declaraciones, vigente del 20 de junio de 2017 al 20 de junio de 2018.

6. De ese modo, Universal expidió la póliza número 09-560-000549716-1/000 a nombre de SRA con efectividad del 20 de junio de 2017 al 20 de junio de 2018.

7. La póliza estaba vigente para el 20 de septiembre de 2017.

8. La póliza cuenta con una cubierta de propiedad comercial (Commercial Property).

9. Las declaraciones de propiedad comercial (Commercial Property Renewal Declaration) identifican seis (6) locales objeto de esa sección de la póliza que tienen cubierta de contenido o propiedad personal del negocio (Business Personal Property) y de pérdida de ingreso del negocio y gastos adicionales (Business Income and Extra Expense):

> a. Location 1- #391 Domenech Ave., San Juan, PR 00936;
> b. Location 2- #390 Domenech Ave., San Juan, PR 00936;
> c. Location 3- #62 Antonio López St., Humacao, PR 00791;
> d. Location 4- #60 Antonio López St., Humacao, PR 00791;
> e. Location 5- Ave. Boulevard del Río #2, Humacao, PR 00791; y
> f. Location 6- Fondo del Seguro del Estado, Fajardo, PR 00738.

10. Es decir, la cubierta de propiedad comercial (Commercial Property) de la póliza suscrita entre las partes no incluyó una localidad de Carolina.

11. La forma CP 00 10 10 12 de la póliza, titulada Building and Personal Property Coverage Form, establece la cubierta de seguro para el contenido (Business Personal Property) en su inciso A.1.b., el cual dispone lo siguiente:

> A. Coverage
> We will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss.
>
> 1. Covered Property Covered Property, as used in this Coverage Part, means the type of property described in this section, A.1., and limited in A.2. Property Not Covered, if a Limit Of Insurance is shown in the Declarations for that type of property. […]
>
> b. Your Business Personal Property consists of the following property located in or on the building or structure described in the Declarations or in the open (or in a vehicle) within 100 feet of the building or structure or within 100 feet of the premises described in the Declarations, whichever distance is greater: […]
>
> (2) Machinery and equipment; […].

12. La cubierta de la póliza para Building and Personal Property está sujeta a un límite monetario tipo *Blanket* de $2,581,550.00 aplicable únicamente a los locales 1 al 6 identificados en las declaraciones de propiedad comercial.

13. El endoso CP 03 30 10 12 (Puerto Rico – Windstorm Percentage Deductible Clauses) y su declaración suplementaria SD0001 0110 (Supplemental Form Declaration for CP0330 1012) establecen los deducibles aplicables por propiedad para pérdidas de propiedad personal del negocio (Business Personal Property) causadas por huracán:

      i. Location 1- $400;
      ii. Location 2- $7,000;
      iii. Location 3- $5,540;
      iv. Location 4- $300; v. Location 5- $1,911; y
      vi. Location 6- $7,070.

14. La forma CP 00 30 10 12 (*Business Income (and Extra Expense) Coverage Form*) establece la cubierta de seguro para pérdidas de ingresos del negocio (Business Income) en su inciso A.1., el cual dispone lo siguiente:

    A.   Coverage
    1.   Business Income
        Business Income means the:

        a. Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred; and

        b. Continuing normal operating expenses incurred, including payroll. […]

        We will pay for the actual loss of Business Income you sustain due to the necessary "suspension" of your "operations" during the "period of restoration". The "suspension" must be caused by direct physical loss of or damage to property at premises which are described in the Declarations and for which a Business Income Limit Of Insurance is shown in the Declarations. The loss or damage must be caused by or result from a Covered Cause of Loss. With respect to loss of or damage to personal property in the open or personal property in a vehicle, the described premises include the area within 100 feet of such premises. […].

15. La forma CP 00 30 10 12 (*Business Income (and Extra Expense) Coverage Form*) establece la cubierta de seguro para gastos adicionales (*Extra Expense*) en su inciso A.2., el cual dispone lo siguiente:

        2. Extra Expense
        a. Extra Expense Coverage is provided at the premises described in the Declarations only if the Declarations show that Business Income Coverage applies at that premises.

        b. Extra Expense means necessary expenses you incur during the "period of restoration" that you would not have incurred if there had been no direct physical loss or damage to property caused by or resulting from a Covered Cause of Loss. We will pay Extra Expense (other than the expense to repair or replace property) to:

        (1) Avoid or minimize the "suspension" of business and to continue operations at the described premises or at replacement premises or temporary locations, including relocation expenses and costs to equip and operate the replacement location or temporary location.

        (2) Minimize the "suspension" of business if you cannot continue "operations". We will also pay Extra Expense to repair or replace property, but only to the extent it reduces the amount of loss that otherwise would have been payable under this Coverage Form.

16. La cubierta de la póliza para *Business Income and Extra Expense* está sujeta a un límite monetario tipo *Blanket* de $500,000.00 para los locales 1 al 6 identificados en las declaraciones de propiedad comercial.

17. La forma CP 10 30 10 12 de la póliza, titulada *Causes of Loss – Special Form*, establece los riesgos para los cuales la sección de propiedad comercial de la póliza provee cubierta en su inciso A, la cual dispone lo siguiente:

    1.   Covered Causes Of Loss
        When Special is shown in the Declarations, Covered Causes of Loss means direct physical loss unless the loss is excluded or limited in this policy.

18. El inciso B.2.a. establece uno de los riesgos excluidos de la cubierta de propiedad por la forma CP 10 30 10 12, donde se dispone lo siguiente:

B. Exclusions

1. […]
2. We will not pay for loss or damage caused by or resulting from any of the following:

a. Artificially generated electrical, magnetic or electromagnetic energy that damages, disturbs, disrupts or otherwise interferes with any:

(1) Electrical or electronic wire, device, appliance, system or network; or

(2) Device, appliance, system or network utilizing cellular or satellite technology. For the purpose of this exclusion, electrical, magnetic or electromagnetic energy includes but is not limited to:

(a) Electrical current, including arcing;
(b) Electrical charge produced or conducted by a magnetic or electromagnetic field;
(c) Pulse of electromagnetic energy; or
(d) Electromagnetic waves or microwaves. But if fire results, we will pay for the loss or damage caused by that fire.

19. El inciso B.2.b. establece uno de los riesgos excluidos de la cubierta de propiedad por la forma CP 10 30 10 12, donde se dispone lo siguiente:

B. Exclusions
1. […]
2. We will not pay for loss or damage caused by or resulting from any of the following:
a. […]
b. Delay, loss of use or loss of market. […].

20. La forma UEB 00 01 10 11 de la póliza, titulada *Equipment Breakdown Coverage*, modifica la cubierta provista bajo las formas *Building and Personal Property Coverage Form y Causes of Loss – Special Form*.

21. La cláusula A.(1)(b) de la forma UEB 00 01 10 11 dispone lo siguiente:

A. The BUILDING AND PERSONAL PROPERTY COVERAGE FORM is modified as follows:

ADDITIONAL COVERAGES
The following is added to 4. ADDITIONAL COVERAGES:

Equipment Breakdown
(1) We will pay for direct physical damage to Covered Property that is the direct result of an "accident". As used in this Additional Coverage, "accident" means a fortuitous event that causes direct physical damage to "covered equipment." The event must be one of the following:
(a) […];
(b) artificially generated electrical current, including electric arcing, that disturbs electrical devices, appliances or wires; (c) […].

22. La cláusula A.(2)(h) de la forma UEB 00 01 10 11 dispone lo siguiente:

(2) Unless otherwise shown in an Equipment Breakdown Coverage Schedule, the following coverages also apply to the direct result of an "accident." These coverages do not provide additional amounts of insurance.

(a) […];
(h) Business Income and Extra Expense
Any insurance provided under this coverage part far Business Income or Extra Expense is extended to the coverage provided by this endorsement. The most we will pay for loss of Business Income you sustain or necessary Extra Expense you incur is the limit shown in the Declarations for that coverage, unless otherwise shown in an Equipment Breakdown Coverage Schedule.

23. La cláusula B.(a)(i) de la forma UEB 00 01 10 11 dispone lo siguiente:

B. The CAUSES OF LOSS - BASIC FORM OR SPECIAL FORM is modified as follows:

EXCLUSIONS
All exclusions and limitations in the Causes of Loss form apply except as modified below and to the extent that coverage is specifically provided by this Additional Coverage Equipment Breakdown.

(a) The following do not apply:
(i) In the Causes of Loss -Special Form: a. Exclusions B.2.a., B.2.d. (6) and B.2.e.; and b. […].

The most we will pay for loss, damage or expense under this endorsement arising from any "one accident" is the applicable Limit of Insurance in the Declarations unless otherwise shown in an Equipment Breakdown Coverage Schedule. Coverage provided under this endorsement does not provide an additional amount of insurance.

24. La cubierta añadida por la forma UEB 00 01 10 11 de la póliza a la cubierta propiedad aplica a los locales 1 al 6 identificados en las declaraciones de propiedad comercial, pues queda claro que se refiere que esa cubierta se refiere a las seis localidades allí identificadas.

25. En fin, el endoso *Equipment Breakdown Coverage* (UEB0001 10-11) que obra en la póliza es parte de la cubierta de propiedad (*Commercial Property*). Así lo reconoció expresamente por el Sr. Javier Calderón, corredor de seguros de la parte demandante.

26. El local de Carolina de SRA no forma parte de la cubierta de propiedad (*Commercial Property*) de la póliza. Esto fue reconocido expresamente por el Sr. Javier Calderón, corredor de seguros de la parte demandante.

27. El límite *blanket* en la cubierta de propiedad (*Commercial Property*) aplica únicamente a las 6 propiedades listadas en las declaraciones, entre las cuales no se encuentra Carolina. Esto fue reconocido expresamente por el Sr. Javier Calderón, corredor de seguros de la parte demandante.

28. Por otro lado, la póliza cuenta con una cubierta separada de la de propiedad comercial conocida como *Commercial Inland Marine*.

29. Las declaraciones de la sección de *Commercial Inland Marine* de la póliza (*Commercial Inland Marine Renewal Declaration*) indican que dicha sección incluye una cubierta de equipo médico y quirúrgico (*Physicians and Surgeons*).

30. La cubierta para equipo médico y quirúrgico (*Physicians and Surgeons*) incluida en la sección de *Commercial Inland Marine* de la póliza está sujeta a un límite monetario tipo *Blanket* de $1,575,000 para las siguientes propiedades:

i. #390 Domenech Ave., San Juan, PR;
ii. #62 Antonio López St., Humacao, PR;
iii. #60 Antonio López St., Humacao, PR;
iv. Ave. Boulevard Del Río #2, Humacao, PR;
v. Fondo del Seguro del Estado, Fajardo, PR; y
vi. Villa Fontana Shopping Center Local A#5, Carolina, PR.

31. Las declaraciones de la sección de *Commercial Inland Marine* de la póliza establecen un deducible de $500.00 aplicable a la cubierta de corriente no generada artificialmente (*Other than Artificially Generated Current*) incluida en la cubierta de *Physicians and Surgeons*.

32. La forma CM 00 26 01 13 (Physicians and Surgeons Equipment Coverage Form) establece la cubierta de seguro para el equipo médico y quirúrgico en su inciso A.1.a., el cual dispone lo siguiente:

A. Coverage
We will pay for direct physical loss of or damage to Covered Property from any of the Covered Causes of Loss.

1. Covered Property, as used in this Coverage Form, means:

a. Your medical and dental equipment, materials, supplies and books usual to the medical or dental profession. At your option this form covers similar property of others used by you in your profession. […].

33. La forma CM 00 26 01 13 establece los riesgos para los que provee cubierta de equipo médico y quirúrgico en su inciso A.3., el cual dispone lo siguiente:

3. Covered Causes Of Loss
Covered Causes of Loss means direct physical loss or damage to Covered Property except those causes of loss listed in the Exclusions.

34. El inciso B.2.b. establece uno de los riesgos excluidos de la cubierta de equipo médico y quirúrgico la forma CM 00 26 01 13, al disponer lo siguiente:

B. Exclusions
2. We will not pay for loss or damage by or resulting from any of the following: […]
b. Delay, loss of use, loss of market or any other consequential loss. […].

35. El inciso B.2.e. establece uno de los riesgos excluidos de la cubierta de equipo médico y quirúrgico la forma CM 00 26 01 13, al disponer lo siguiente:

B. Exclusions

2. We will not pay for loss or damage by or resulting from any of the following: […]

e. Artificially generated electrical, magnetic or electromagnetic energy that damages, disturbs, disrupts or otherwise interferes with any:

(1) Electrical or electronic wire, device, appliance, system or network; or

(2) Device, appliance, system or network utilizing cellular or satellite technology; creating a short circuit or other electric disturbance within an article covered under this Coverage Form.

For the purpose of this exclusion, electrical, magnetic or electromagnetic energy includes, but is not limited to, electrical current, including arcing; electrical charge produced or conducted by a magnetic or electromagnetic field; pulse of electromagnetic energy; electromagnetic waves or microwaves.

But if artificially generated electrical, magnetic or electromagnetic energy, as described above, results in fire or explosion, we will pay for the direct loss or damage caused by that fire or explosion if the fire or explosion would be covered under this Coverage Form.

This exclusion only applies to loss or damage to that article in which the disturbance occurs.

36. Como se puede apreciar, la forma *Physicians and Surgeons Equipment Coverage Form* incluida en la cubierta *Commercial Inland Marine* de la póliza excluye expresamente daños causados por alteraciones de corrientes eléctricas (exclusión e.).

37. SRA es dueña y/o mantiene facilidades alquiladas en las siguientes propiedades: Núm. 390 Avenida Domenech, San Juan; Núm. 391 Avenida Domenech, San Juan; Núm. 60 Calle Antonio López, Humacao; Núm. 62 Calle Antonio López, Humacao; Núm. 32, Ave. Boulevard del Rio, Corporación del Fondo de Seguro del Estado, Humacao; Corporación del Fondo de Seguro del Estado, Fajardo; Villa Fontana Shopping Center, Local A#5, Carolina; Núm. 64 Calle Antonio López, Humacao; y Núm. 528, Calle Cabo Alverio, Urb. Domenech, San Juan.

38. SRA no es dueña, sino que arrendaba, el local de Carolina que ubica en un centro comercial.

39. SRA mantenía un equipo de Resonancia Magnética (MRI) en la localidad de Carolina.

40. La capacidad del equipo de MRI ubicado en el local de SRA en Carolina era de 0.7 Tesla.

41. El 20 de septiembre de 2017 pasó por Puerto Rico el Huracán María.

42. El 17 de abril de 2018, la demandante reportó a Universal que la propiedad asegurada sufrió daños a consecuencia del Huracán María.

43. Este aviso de pérdida ("*Property Loss Notice*") remitido a Universal incluyó una reclamación junto con ciertos documentos de apoyo.

44. El aviso de pérdida (*Property Loss Notice*) reportó los siguientes daños: "*windstorm, fire, business interruption, extra expense*".

45. El 17 de abril de 2018, Universal acusó recibo de la reclamación y le asignó el número de reclamación 2020036.

46. El Sr. Javier Calderón es el corredor de seguros de SRAI y fue quien se encargó de presentar la reclamación a Universal. Este también se ha identificado como un representante autorizado de Universal.

47. Universal contrató la firma de ajustadores independientes de McLarens International ("McLarens") para ajustar las pérdidas de SRAI ocasionadas por el Huracán María.

48. Por recomendación del Sr. Javier Calderón, SRAI contrató al CPA Jorge A. Rodríguez ("CPA Rodríguez") para asistirle con la tarea de redactar y recopilar la data relacionada con su reclamación por el Huracán María antes de presentarla a la aseguradora.

49. Como parte de su trabajo, McLarens realizó la investigación de esta pérdida, visitó las instalaciones del asegurado ubicadas en la Ave. Domenech #390, se comunicó con el CPA Jorge Rodríguez y evaluó en conjunto con la contable forense Margarita Rivera la reclamación de interrupción de negocios.

50. El 9 de mayo de 2018, el Sr. Daniel Muñoz de la firma de McLarens International solicitó por escrito fotografías asociadas a los daños reclamados en las planillas Excel para *personal property*, equipos médicos y *building*.

51. El informe de McLarens International con fecha del 6 julio de 2018 describe el siniestro de la siguiente manera: "EL EVENTO AFECTÓ OFICINAS MEDICAS RADIOLOGICAS, DAÑANDO EDIFICIO, CONTENIDOS Y EQUIPOS. LA FALTA DE ENERGIA ELECTRICA OCASIONÓ DAÑOS EN LOS EQUIPOS RADIOLOGICOS Y OCASIONÓ PÉRDIDAS ECONOMICAS AL NO PODER ATENDER PACIENTES EN FORMA HABITUAL".

52. En su informe McLarens International detalla lo siguiente:

[p]osteriormente, con fecha 15 de junio del 2018, acudimos junto al productor de seguros a las instalaciones de Avda. Domenech # 390 con el fin de obtener en terreno una mejor calidad de información de las pérdidas, y alcance de los daños. En esa visita se pudo establecer que los equipos de MRI (Magnetic Resonance Imaging), resultaron dañados por la falta de energía eléctrica, ya que deben estar alimentados eléctricamente las 24 horas y todos los días, para que el compresor mantenga el helio en estado líquido (-270 grados centígrados) el cual enfría la bobina del imán del equipo. Al no funcionar el compresor (ubicado en la techumbre del recinto), la temperatura del helio aumenta hasta volverse un gas, evaporándose, afectando la calibración del equipo, dañando componentes internos, hasta afectar gravemente el equipo MRI.

53. El Informe Parcial PRUN 4030 (DMV) de McLarens International, con fecha del 6 de julio de 2018, Claims No. 2020036, establece que [:]

> [L]a reclamación enviada por el asegurado considera las pérdidas económicas por la interrupción de negocio, gastos extras por reposición de helio, reparaciones de urgencia, etc., además de daños ocasionados por el viento y lluvia en edificio, contenidos y equipos. A petición del Asegurado, a través del productor de seguros, hemos procedido a liquidar las pérdidas asociadas a la interrupción de negocios (Business Income y Utility Services) y gastos extras, dejando para más adelante el análisis de las pérdidas materiales de los contenidos y los equipos médicos (que serán analizados bajo la cobertura de Equipment Breakdown).

54. Como resultado del reporte de McLarens, Universal procedió a liquidar la pérdida de interrupción de negocio y gastos adicionales para finales de junio del 2018.

55. A petición de SRA, a través de su productor de seguros, y con el propósito de que no se detuviese el pago de interrupción de negocio y gastos extra hasta que finalizaran todos los trámites, se dejó para más adelante el análisis de las pérdidas materiales de los equipos médicos.

56. Universal cursó una oferta de pago final por la cuantía de $500,000, que es el límite de responsabilidad de la póliza bajo la cubierta de *Business Income & Extra Expense*.

57. La parte demandante aceptó la oferta y el 27 de junio de 2018 suscribió con su firma una *Carta de Relevo y Recibo de Subrogación*.

58. El 12 de julio de 2018 Universal emitió el cheque número 659649 por la cantidad de $500,000.00 a nombre de la parte demandante.

59. El cheque fue recogido personalmente por el productor Javier Calderón y posteriormente cobrado por el demandante.

60. La referida suma pagada por Universal equivale al límite de su responsabilidad para la cubierta de ingresos del negocio y gastos adicionales (*Business Income and Extra Expense*).

61. De hecho, surge del informe de McLarens que las pérdidas de ingresos y gastos adicionales reclamadas por SRA excedían el límite contractual de $500,000 y que las pérdidas ajustadas para las localidades de Domenech y Humacao, por sí solas, también excedían el límite contractual de $500,000 para esos fines. En específico, la pérdida de Humacao se estimó en $370,513.99 y la pérdida de Domenech se estimó en $209,956.56. Por consiguiente, la suma de ambas localidades excedía el límite indemnizable bajo la cubierta de *Business Income and Extra Expense*.

62. Luego del pago de la reclamación de *Business Income & Extra Expense*, quedó pendiente culminar la investigación y realizar el ajuste de la pérdida relacionada con propiedad personal del negocio.

63. A la fecha en que se realizó el pago bajo la cubierta de *Business Income and Extra Expense*, los ajustadores de McLarens habían inspeccionado solo la propiedad ubicada en el Núm. 390 de la Avenida Domenech y el equipo de MRI que allí se encontraba.

64. El 13 de noviembre de 2018, Universal recibió un correo electrónico de la Sra. Rosa Loza de la oficina del corredor de seguros de SRA, en el que se indicaba lo siguiente: "Para añadir este equipo a la reclamación en referencia. […]" e incluía dos documentos titulados "Reporte de Insidente(sic) Huracán María – SRAIC Carolina" y "Cotización" de 10 de enero de 2018 preparados por el Sr. Dionicio Durán de la firma Medintek.

65. El "Reporte de Insidente"(sic) preparado por el Sr. Dionicio Durán de la firma Medintek indicaba que el equipo de "MRI High Field Open de 0.7 Tesla" que SRA mantenía en su oficina de Carolina sufrió daños provocados por la inestabilidad eléctrica cuando se restableció el servicio de electricidad tras el paso del Huracán María:

> [L]a inestabilidad eléctrica provocó averías en el chiller y en el coldhead. Con el sistema de refrigeración apagado no se retiraba el calor del interior(sic) del magneto y con el paso de los días(sic) el hélio(sic) líquido fue pasando a estado de gas y poco a poco fue aumentando la presión y la ebullición interna y eventualmente(sic) el magneto sufrió un "quench" que es un fenómeno(sic) donde

súbitamente se dicipó(sic) toda la energía(sic) y también perdió todo el helio liquido(sic) remanente lo cual a su vez llevó el interior del magneto a un aumento de temperatura hasta llegar una temperatura similar a la temperatura ambiental y con ello la camara(sic) de vacio(sic) se contaminó.

66. El costo de reparación del equipo de MRI High Field Open modelo High Speed que SRA mantenía en su oficina de Carolina ascendía a $129,600.00, según la "Cotización" con fecha de 10 de enero de 2018 preparada por el Sr. Dionicio Durán de la firma Medintek.

67. La recomendación del técnico que preparó el informe notificado a Universal el 13 de noviembre de 2018 sobre el equipo de MRI de Carolina fue reparar el equipo.

68. Los tres socios de SRA tomaron la decisión de no reparar la máquina de MRI de Carolina.

69. Según el técnico que preparó el informe notificado a Universal el 13 de noviembre de 2018 sobre el equipo de MRI de Carolina, desde al menos seis años antes del 2022, el estándar mínimo de capacidad para una máquina de MRI es de 1.5 Tesla.

70. El único equipo de MRI para el cual se presentó un análisis técnico y cotización mediante la comunicación del 13 de noviembre de 2018 fue el "MRI High-Field Open de 0.7 Tesla" ubicado en las facilidades de Carolina.

71. La única instalación de SRA en donde se opera un Open MRI High Field es en Carolina, ya que en las demás oficinas los equipos de MRI son High Field, pero no son Open.

72. Mediante carta fechada al 15 de noviembre de 2018, el ajustador Ángel Molina de Universal le comunicó a SRA lo siguiente:

Hacemos referencia a la reclamación de los daños reclamados al equipo Open MRI High Field de su oficina.

Luego de verificar la póliza que posee con nuestra compañía encontramos que la misma no posee cubierta para dicha situación. A continuación citamos las secciones de la póliza que aplican a esta situación:

PHYSICIANS AND SURGEONS EQUIPMENT COVERAGE FORM (CM0026 01-13)

B. Exclusions
1. We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.

e. Artificially generated electrical, magnetic or electromagnetic energy that damages, disturbs, disrupts or otherwise interferes with any:

(1) Electrical or electronic wire, device, appliance, system or network; or
(2) Device, appliance, system or network utilizing cellular or satellite technology; creating a short circuit or other electric disturbance within an article covered under this Coverage Form.

For the purpose of this exclusion, electrical, magnetic or electromagnetic energy includes, but is not limited to, electrical current, including arcing; electrical charge produced or conducted by a magnetic or electromagnetic field; pulse of electromagnetic energy; electromagnetic waves or microwaves.

But if artificially generated electrical, magnetic or electromagnetic energy, as described above, results in fire or explosion, we will pay for the direct loss or damage caused by that fire or explosion if the fire or explosion would be covered under this Coverage Form. This exclusion only applies to loss or damage to that article in which the disturbance occurs. Por las(sic) razón antes mencionada no

podemos honrar esta reclamación, nuestro expediente será cerrado sin pago alguno en el día de hoy.

73. SRA le informó de la carta del ajustador de Universal al CPA Jorge A. Rodríguez, quien se reunió con el corredor Javier Calderón y redactó una carta que se envió a Universal.

74. El 6 de diciembre de 2018, el corredor de seguros de SRAI envió una comunicación electrónica al ajustador Ángel Molina de Universal, la cual indicaba lo siguiente:

[…] Recibimos tu carta denegando cubierta bajo la forma de Physicians and Surgeons Equipment. Entendemos que la cubierta para los equipos está en la forma de Equipment Breakdown # UEB 00 01 (10/11), que forma parte de la póliza de nuestro asegurado. Específicamente, la cubierta se encuentra en las secciones 1 (b) y 2 (g) de dicha forma. Te las marqué en highliter (sic) para que se te haga más fácil encontrarlas.

75. Luego de que se remitiera la comunicación electrónica del 6 de diciembre de 2018 a Universal, el corredor de seguros Javier Calderón y el CPA Jorge A. Rodríguez se reunieron con el Sr. José Ortiz de Universal para discutir la denegación de cubierta que se le había notificado a SRAI.

76. El 15 de febrero de 2019, Universal contestó por escrito la comunicación electrónica del 6 de diciembre de 2018 del corredor de seguros de SRAI, expresando lo siguiente:

A petición de su agente de seguros, Javier Calderón, nos solicita que la pérdida sea evaluada bajo la sección I de la cubierta de Propiedad ya que la misma fue declinada el 15 de noviembre de 2018 bajo la sección III de la cubierta de Physicians and Surgeons Equipment Coverage Form. Adjunto copia de la carta.

Favor de referirse a la siguiente sección de la póliza: BUILDING AND PERSONAL PROPERTY COVERAGE FORM CP 00 10 10 12 3. Property Not Covered
Covered Property does not include:

j. Property that is covered under another coverage form of this or any other policy in which it is more specifically described, except for the excess of the amount due (whether you can collect on it or not) from that other insurance;

Como podrás observar, la sección I no provee cubierta para equipos médicos ya que los mismos están específicamente cubiertos bajo la cubierta Physicians and Surgeons Equipment Coverage Form. En adición, en la sección I de la póliza no encontramos el local donde se encontraba el equipo. Por las razones antes mencionada(sic) nos mantenemos firme(sic) en nuestra posición, el caso permanecerá cerrado.

77. Aunque la reclamación se hizo desde un principio, SRA no notificó informes técnicos en cuanto a los demás equipos de MRI, aparte del Open MRI High Field de Carolina, porque su corredor de seguros entendió que la aseguradora también le negaría cubierta para los otros equipos.

78. A finales de 2016, los socios de SRA recibieron una oferta de $1.2 millones por parte de otro radiólogo, doctor Fumero, para este adquirir las operaciones de SRAI en la oficina de Carolina.

79. La oferta del doctor Fumero no se puso por escrito.

80. La oferta de $1.2 millones fue rechazada porque uno de los socios de SRAI, el doctor Pérez, no quería vender la oficina de Carolina.

81. Luego del paso del Huracán María, el doctor Fumero volvió a hacer gestiones para tratar de adquirir la oficina de Carolina, por lo cual los socios de SRAI procuraron que se realizara una valorización formal de la oficina de Carolina.

82. La valorización de la oficina de Carolina fue realizada por el CPA Jorge Rodríguez en junio de 2018.

83. La valorización de la oficina de Carolina en junio de 2018 ascendió a una cantidad entre $1.5 y $1.7 millones.

84. La oferta que los socios de SRA recibieron en dicho momento luego del huracán María del doctor Fumero para adquirir las operaciones de Carolina fue de $750,000.

85. 72. SRA no aceptó la oferta de $750,000 del doctor Fumero.

86. Posteriormente, en el año 2019 el doctor Fumero se asoció con los doctores Pedro Díaz y Roberto De Jesús y reanudó la posibilidad de comprar la oficina de Carolina con una oferta de $850,000, incluyendo también en la oferta la compra de las operaciones de la Ave. Domenech en San Juan por $1.2 millones.

87. La nueva oferta del doctor Fumero para Carolina y San Juan no se logró concretar porque no era conveniente, ya que los socios de SRA tenían que asumir la responsabilidad de despedir y pagar la mesada a los empleados.

88. Posteriormente, se inició un proceso para separar las operaciones de Humacao en una nueva entidad y mantener solo las de Carolina y San Juan en SRAI, para entonces ponerlas a la venta, pero el proceso no es fácil porque cada plan médico tiene que aceptar la nueva entidad.

89. Las conversaciones con el doctor Fumero sobre una eventual venta de las operaciones de Domenech y Carolina quedaron en suspenso.

90. SRA presentó la demanda de epígrafe contra Universal el 17 de septiembre de 2019 y la demanda enmendada el 20 de septiembre de 2019.

91. El Ing. Michael Doron Flores es ingeniero autorizado a ejercer como tal en Puerto Rico con licencia núm. 13916 expedida por el Departamento de Estado de Puerto Rico.

92. El Ing. Doron Flores obtuvo su bachillerato de ingeniería en Atlanta, Georgia, EEUU, específicamente en la rama de la ingeniería mecánica.

93. El 21 de octubre de 2020, Universal remitió a la demandante una *Citación y Solicitud para Permitir la Inspección del Equipo Médico y Producir la Información Pertinente del Equipo Médico*, la cual incluía una lista detallada de la información que necesitaba conocer el Ing. Doron Flores en torno a cada equipo de MRI y un resumen del procedimiento a llevar a cabo por el perito durante las inspecciones de los equipos, que incluía revisar las bitácoras (logs) y hojas de servicio de los mismos, advirtiendo que, luego de las inspecciones se remitiría una lista adicional de información y documentación necesaria para completar la evaluación y rendir el informe.

94. Las inspecciones de los equipos de MRI por parte del Ing. Doron Flores se llevaron a cabo el 30 de octubre de 2020 para cada equipo ubicado en las facilidades de Carolina y Fajardo y el 17 de noviembre de 2020 para cada equipo ubicado en las facilidades de Domenech y Humacao.

95. La parte demandante contestó la solicitud de información contenida en la citación mediante correo electrónico del 10 de diciembre de 2020, luego de las inspecciones del Ing. Doron Flores.

96. El 23 de diciembre de 2020, Universal remitió a la parte demandante un *Segundo Interrogatorio y Tercer Requerimiento de Producción de Documentos*, el cual incluía una lista de la información y documentos que necesitaba el perito Doron Flores para poder rendir su informe a raíz de sus visitas e inspecciones a las 4 localidades de SRA entre la que se encontraba una solicitud para que la parte demandante proveyera copias de los cheques y/o evidencias de pago de las reparaciones efectuadas con posterioridad al Huracán María en las unidades de MRI.

97. El 9 de junio de 2021, la parte demandante remitió a Universal sus contestaciones en torno al *Segundo Interrogatorio y Tercer Requerimiento de Producción de Documentos* junto con una comunicación que expresaba haber incluido todos los documentos requeridos.

98. El Ing. Doron Flores obtuvo y evaluó toda la información provista por la parte demandante.

99. El Ing. Doron Flores rindió su informe fechado al 19 de septiembre de 2021 donde evaluó los reportes, estimados y facturas provistas por la parte demandante, los cuales fueron anejados a su informe.

100. El Ing. Michael Doron, perito de Universal (en capacidad de ingeniero mecánico y no como ajustador), en su informe del 19 de septiembre de 2021 estimó daños a cuatro (4) máquinas MRI de SRA por la suma total de $422,158.27, incluyendo la de Carolina.

101. Al momento de presentarse la demanda, Universal no había pagado a SRA por los daños a los equipos de MRI de ninguna de las referidas cuatro (4) máquinas que ubican en distintas localidades. No obstante, solo para uno de estos cuatro (4) equipos, el que está ubicado en Carolina, Universal le informó a SRA que no tiene cubierta para los daños causados por alteraciones en la corriente eléctricas tras el paso del huracán María.

102. En su oposición a la sentencia sumaria de SRA y la moción de consignación presentada el 13 de diciembre de 2023, Universal asumió la responsabilidad de pagar los daños provocados a los equipos de San Juan, Humacao y Fajardo, consignando la suma de $282,883.47 para esos fines.

103. El 3 de enero de 2024, la parte demandante se opuso a la consignación al no cumplir con las formalidades para ello y al no incluir ciertas partidas, tal como los intereses pre-sentencia, el valor actual de los daños, los daños al MRI del CFSE de Humacao y al MRI de Carolina, entre otros.

104. La parte demandante carece de un informe pericial preparado por un experto en la materia en torno al valor de los daños sufridos por los equipos de MRI por causa de fluctuaciones en el voltaje relacionadas con el impacto del Huracán María al sistema eléctrico de Puerto Rico.

105. La única prueba pericial anunciada por la parte demandante es un informe de pérdida económica preparado por el CPA Jorge Rodríguez y otro informe de cubierta preparado por el Sr. José Serrano.

106. La parte demandada no tiene perito de seguros sobre la cubierta e interpretación de la Póliza número 09-560-000549716-1/000 en esta acción.[13]

En la sentencia apelada, el foro primario declaró Ha Lugar la solicitud de sentencia sumaria parcial presentada por Universal. En su consecuencia, desestimó las reclamaciones de la *Demanda Enmendada* relacionadas a la indemnización (contractual y por daños) solicitadas por las alegadas pérdidas de valor de negocio por falta de uso del MRI de Carolina o en otra localidad bajo la cubierta de pérdida de negocios y gastos extra (*Business Income & Extra Expense*). A su vez, declaró Ha Lugar la solicitud de sentencia sumaria parcial presentada por SRAI. Ello a los únicos efectos de ordenar el pago de la cantidad reclamada por las pérdidas del equipo médico para las localidades de San Juan, CFSE, Fajardo y Humacao, descontando lo reclamado por el MRI de Carolina y

---

[13] Apéndice XXIX del recurso, págs. 48-91.

aplicando cualquier deducible o descuento que procediera conforme a los términos de la póliza.

Por otro lado, el foro *a quo* determinó que, aun si la cubierta de pérdida de negocios y gastos extra (*Business Income & Extra Expense*) se hubiese extendido al equipo ubicado en la oficina de Carolina, el límite de responsabilidad establecido por la póliza para esa cubierta era de $500,000.00. Por tanto, SRAI había agotado el límite de la cubierta al emitirse el pago correspondiente a tenor con el informe parcial de los ajustadores de Universal.

El 29 de enero de 2024, SRAI presentó ante el Tribunal de Primera Instancia una *Moción de Reconsideración, Solicitando Corrección y Determinaciones de Hechos Adicionales*.[14] No obstante, la misma fue declarada No Ha Lugar el 2 de febrero de 2024.[15]

Inconforme con dicha determinación, el 4 de marzo de 2024, SRAI acudió ante nos mediante el recurso de epígrafe y realizó los siguientes señalamientos de error:

> Erró el TPI al no declarar Ha Lugar las causas de acción en daños y perjuicios 1) por incumplimiento de contrato, 2) por mala fe y dolo en el cumplimiento de un contrato de seguros, y 3) por no ordenar, por temeridad, el pago de las costas y honorarios.

> Erró el TPI al no reconocer que Universal incumplió el contrato de seguros luego de haber creado una expectativa razonable en su asegurado de que la pérdida del equipo médico en cinco facilidades sería evaluada bajo el endoso *Equipment Breakedown [sic]*, al permitirle negarse a cubrir los daños al MRI en la facilidad de Carolina, y al utilizar definiciones distintas de blanket dentro de una misma póliza e interpretaciones restrictivas a fin de justificar el negar cubierta al equipo médico que se encontraba en propiedad asegurada.

> Finalmente erró el TPI al usurpar funciones legislativas interpretando el Código de Seguros de forma contraria a su intención y dejando que la aseguradora negara reclamaciones fuera del término establecido por Ley.

Luego de varias instancias procesales, el 3 de abril de 2024, Universal presentó *Alegato de Universal en Oposición a Apelación*.

---

[14] Apéndice VI del recurso, págs. 93-105.
[15] Apéndice VII del recurso, págs. 107.

Con el beneficio de la comparecencia de las partes, procedemos a resolver.

**II**

**A**

El mecanismo de sentencia sumaria provisto en la Regla 36 de Procedimiento Civil de 2009, 32 LPRA Ap. V, R. 36, es un vehículo para asegurar la solución justa, rápida y económica de un caso. *Serrano Picón v. Multinational Life Ins.*, 2023 TSPR 118, 212 DPR 981 (2023); *Oriental Bank v. Caballero García*, 2023 TSPR 103, 212 DPR 671 (2023); *González Meléndez v. Mun. San Juan et al.*, 2023 TSPR 95, 212 DPR 601 (2023); *Acevedo y otros v. Depto. Hacienda y otros*, 2023 TSPR 80, 212 DPR 335 (2023); *Universal Ins. y otro v. ELA y otros*, 211 DPR 455 (2023). Dicho mecanismo permite a los tribunales disponer, parcial o totalmente, de litigios civiles en aquellas situaciones en las cuales no exista controversia material de hecho que requiera ventilarse en un juicio plenario y el derecho así lo permita. *Segarra Rivera v. Int'l. Shipping et al.*, 208 DPR 964 (2022). Este mecanismo lo puede utilizar la parte reclamante o aquella parte que se defiende de una reclamación. 32 LPRA Ap. V, R. 36.1 y 36.2.

Mediante el mecanismo de sentencia sumaria, se procura profundizar en las alegaciones para verificar si, en efecto, los hechos ameritan dilucidarse en un juicio. *León Torres v. Rivera Lebrón,* 204 DPR 20, 42 (2020). Este cauce sumario resulta beneficioso tanto para el tribunal, como para las partes en un pleito, pues se agiliza el proceso judicial, mientras simultáneamente se provee a los litigantes un mecanismo procesal encaminado a alcanzar un remedio justo, rápido y económico. *Segarra Rivera v. Int'l. Shipping et al.*, supra. Como se sabe, en aras de prevalecer en una reclamación, la parte promovente debe presentar prueba incontrovertible sobre todos los elementos indispensables de su causa de acción. *Íd.*

Nuestro ordenamiento civil y su jurisprudencia interpretativa impone unos requisitos de forma con los cuales hay que cumplir al momento de

presentar una solicitud de sentencia sumaria, a saber: (1) una exposición breve de las alegaciones de las partes; (2) los asuntos litigiosos o en controversia; (3) la causa de acción sobre la cual se solicita la sentencia sumaria; (4) una relación concisa, organizada y en párrafos enumerados de todos los hechos esenciales y pertinentes sobre los cuales no hay controversia sustancial, con indicación de los párrafos o las páginas de las declaraciones juradas u otra prueba admisible en evidencia donde se establecen estos hechos, así como de cualquier otro documento admisible en evidencia que se encuentre en el expediente del tribunal; (5) las razones por las cuales se debe dictar la sentencia, argumentando el derecho aplicable, y (6) el remedio que debe ser concedido. 32 LPRA Ap. V, R. 36.3; *Oriental Bank v. Caballero García*, supra, pág. 8; *Pérez Vargas v. Office Depot*, 203 DPR 687 (2019). Si la parte promovente de la moción incumple con estos requisitos, "el tribunal no estará obligado a considerar su pedido". *Meléndez González et al. v. M. Cuebas*, 193 DPR 100, 111 (2015).

Por otro lado, "la parte que desafía una solicitud de sentencia sumaria no puede descansar en las aseveraciones o negaciones consignadas en su alegación". *León Torres v. Rivera Lebrón,* supra*,* pág. 43. Por el contrario, quien se opone a que se declare con lugar esta solicitud viene obligado a enfrentar la moción de su adversario de forma tan detallada y específica como lo ha hecho la parte promovente puesto que, si incumple, corre el riesgo de que se dicte sentencia sumaria en su contra, si la misma procede en derecho. *Íd.*

Por ello, en la oposición a una solicitud de sentencia sumaria, la parte promovida debe puntualizar aquellos hechos propuestos que pretende controvertir y, si así lo desea, someter hechos materiales adicionales que alega no están en disputa y que impiden que se dicte sentencia sumaria en su contra. *León Torres v. Rivera Lebrón,* supra. Claro está, para cada uno de estos supuestos deberá hacer referencia a la prueba específica que sostiene su posición, según exigido por la Regla 36.3 de Procedimiento Civil, 32 LPRA Ap. V, R. 36.3. *Íd.* En otras palabras, la

parte opositora tiene el peso de presentar evidencia sustancial que apoye los hechos materiales que alega están en disputa. *Íd.* De lo anterior, se puede colegir que, ante el incumplimiento de las partes con las formalidades de la Regla 36 de Procedimiento Civil de 2009, *supra*, la consideración de sus posiciones descansa en la sana discreción del Tribunal.

Al atender la solicitud, el Tribunal deberá asumir como ciertos los hechos no controvertidos que se encuentren sustentados por los documentos presentados por la parte promovente. *E.L.A. v. Cole*, 164 DPR 608, 626 (2005). Toda inferencia razonable que pueda surgir de los hechos y de los documentos se debe interpretar en contra de quien solicita la sentencia sumaria, pues solo procede si bajo ningún supuesto de hechos prevalece la parte promovida. *Íd.*, pág. 625. Además, al evaluar los méritos de una solicitud de sentencia sumaria, el juzgador o juzgadora debe actuar guiado por la prudencia y ser consciente, en todo momento, que su determinación puede conllevar el que se prive a una de las partes de su "día en corte", componente integral del debido proceso de ley. *León Torres v. Rivera Lebrón,* supra*,* pág. 44.

Sin embargo, la sentencia sumaria generalmente no procederá cuando existan controversias sobre hechos esenciales materiales, o si la controversia del caso está basada en elementos subjetivos como intención, propósitos mentales, negligencia o credibilidad. *Acevedo y otros v. Depto. Hacienda y otros*, supra; *Segarra Rivera v. Int'l. Shipping et al.*, supra. Un hecho material es aquel que puede afectar el resultado de la reclamación de acuerdo con el derecho sustantivo aplicable. *Oriental Bank v. Caballero García,* supra, pág. 7; *Mejías et al. v. Carrasquillo et al.*, 185 DPR 288, 299 (2012); *Ramos Pérez v. Univisión*, 178 DPR 200, 213 (2010). Ahora bien, el Foro de última instancia ha reiterado que cualquier duda no es suficiente para derrotar una moción de sentencia sumaria, pues debe tratarse de una incertidumbre que permita concluir que existe una controversia real sobre hechos relevantes y pertinentes. *Íd.* Además, existen casos que no se

deben resolver mediante sentencia sumaria porque resulta difícil reunir la verdad de los hechos mediante declaraciones juradas o deposiciones. *Jusino et als. v. Walgreens*, 155 DPR 560, 579 (2001). De igual modo, no es apropiado resolver por la vía sumaria "casos complejos o casos que involucren cuestiones de interés público". *Íd.* No obstante, la sentencia sumaria procederá si atiende cuestiones de derecho. *Universal Ins. y otro v. ELA y otros*, supra.

El Tribunal Supremo de Puerto Rico ha discutido los criterios que este Tribunal de Apelaciones debe considerar al momento de revisar una sentencia dictada sumariamente por el foro de instancia. *Roldán Flores v. M. Cuebas et al.*, 199 DPR 664, 679-680 (2018); *Meléndez González et al. v. M. Cuebas*, supra, págs. 118-119. Sobre ese particular, nuestro más Alto Foro señaló que:

> [E]l Tribunal de Apelaciones debe: (1) examinar *de novo* el expediente y aplicar los criterios que la Regla 36 de Procedimiento Civil, *supra*, y la jurisprudencia le exigen al foro primario; (2) revisar que tanto la Moción de Sentencia Sumaria como su oposición cumplan con los requisitos de forma codificados en la referida Regla 36; (3) revisar si en realidad existen hechos materiales en controversia y, de haberlos, cumplir con la exigencia de la Regla 36.4 de Procedimiento Civil, 32 LPRA Ap. V, de exponer concretamente cuáles hechos materiales encontró que están en controversia y cuáles están incontrovertidos, y (4) de encontrar que los hechos materiales realmente están incontrovertidos, debe proceder a revisar *de novo* si el Tribunal de Primera Instancia aplicó correctamente el Derecho a la controversia. *Roldán Flores v. M. Cuebas et al.,* supra, pág. 679.

Conforme a lo anterior, nos encontramos en la misma posición que el Tribunal de Primera Instancia para evaluar la procedencia de una sentencia sumaria. *Birriel Colón v. Econo y otros*, 2023 TSPR 120, 213 DPR ___ (2023); *Serrano Picón v. Multinational Life Ins.*, supra; *González Meléndez v. Mun. San Juan et al.*, supra; *González Santiago v. Baxter Healthcare*, 202 DPR 281, 291 (2019). Por ello, nuestra revisión es una *de novo* y nuestro análisis debe regirse por las disposiciones de la Regla 36 de Procedimiento Civil, *supra*, así como de su jurisprudencia interpretativa. *González Meléndez v. Mun. San Juan et al.*, supra. A tenor con la referida normativa, dicha revisión se realizará de la manera más favorable hacia la

parte que se opuso a la solicitud de sentencia sumaria en el foro de origen y realizando todas las inferencias permisibles a su favor. *Birriel Colón v. Econo y otros*, supra; *Meléndez González et al. v. M. Cuebas*, supra, pág. 118. De esta manera, si entendemos que los hechos materiales realmente están incontrovertidos, debemos revisar *de novo* si el foro primario aplicó correctamente el derecho. *González Meléndez v. Mun. San Juan et al.*, supra.

**B**

El negocio de seguros se encuentra revestido de un alto interés público por el rol vital que juega esa industria en la sociedad y economía. *OCS v. Universal*, 187 DPR 164, 174 (2012). El contrato de seguro es aquel mediante el cual una persona se obliga a indemnizar a otra o a pagarle o a proveerle un beneficio específico o determinable de producirse un suceso incierto previsto en el mismo. 26 LPRA sec. 102. Al suscribir un contrato de seguros, los aseguradores "asumen la carga económica de los riesgos transferidos a cambio de una prima". *Coop. Ahorro y Créd. Oriental v. S.L.G.*, 158 DPR 714, 721 (2003). Ante ello, es evidente que el propósito de todo contrato de seguro es la indemnización y la protección en caso de producirse el suceso incierto previsto en este. *S.L.G. Francis-Acevedo v. SIMED*, 176 DPR 372, 384 (2009).

El Código de Seguros de Puerto Rico, Ley Núm. 77 de 19 de junio de 1957, según enmendada, 26 LPRA sec. 101 *et seq.* (Código de Seguros), regula las prácticas comerciales de esta industria. Uno de los renglones mayormente regulado por dicho estatuto es el perteneciente a las prácticas desleales y fraude en el negocio de los seguros. 26 LPRA secs. 2701-2740; *Carpets & Rugs v. Tropical Reps,* 175 DPR 615, 632 (2009); *Comisionado de Seguros v. PRIA*, 168 DPR 659, 671 (2006). Como parte de las prácticas desleales detalladas allí, se encuentran aquellas relacionadas al ajuste de reclamaciones. *Carpets & Rugs v. Tropical Reps,* supra, pág. 632. El Artículo 27.161 del Código de Seguros, 26 LPRA sec.

2716a, regula el ajuste de las reclamaciones e incluye una larga lista de actos que se considerarán como prácticas desleales.

A su vez, el Código de Seguros, *supra*, establece los términos que tienen las aseguradoras para completar el ajuste de reclamaciones presentadas por sus aseguradas. En específico, el Artículo 27.162 del Código de Seguros, 26 LPRA sec. 2716b, dispone lo siguiente:

> (1) La investigación, ajuste y resolución de cualquier reclamación se hará en el período razonablemente más corto dentro de noventa (90) días después de haberse sometido al asegurador la reclamación.
>
> (2) En el caso de que un asegurador no pueda resolver una reclamación en el término establecido en el inciso (1) de esta sección, deberá mantener en sus expedientes los documentos que acrediten la existencia de justa causa para exceder el término anteriormente dispuesto.
>
> (3) El Comisionado en cualquier momento podrá ordenar la resolución inmediata de cualquier reclamación si considera que se está dilatando o retrasando indebida e injustificadamente la resolución de la misma.

En *Com. Seguros P.R. v. Gen. Accident Ins. Co.*, 132 DPR 543, 551 (1993), el Tribunal Supremo de Puerto Rico estableció que el término máximo de noventa (90) días para la resolución de una reclamación se contará a partir del momento en que el asegurado presenta la reclamación.

De igual forma, nuestro ordenamiento jurídico ha reconocido que una reclamación se entiende resuelta una vez la aseguradora notifica a la persona asegurada el ajuste final de la reclamación presentada. Sin embargo, la aseguradora cumple con su obligación cuando la oferta es razonable. Conforme a ello, de existir controversia sobre el ajuste, el Comisionado de Seguros tendrá que decidir. *Carpets & Rugs v. Tropical Reps*, supra, pág. 632.

Al momento de evaluar una reclamación, es obligación de la aseguradora realizar una investigación diligente que incluya: (1) determinar si el evento damnificador ocurrió durante la vigencia de la póliza; (2) determinar si la persona asegurada reclamante tenía un interés asegurable; (3) determinar si la propiedad damnificada es aquella descrita en las declaraciones; (4) confirmar si las perdidas reclamadas no están

sujetas a exclusiones de riesgos, e (5) investigar si el daño fue causado por negligencia de un tercero, de modo tal que la aseguradora pueda subrogarse en los derechos de resarcimiento de su asegurada. Véase, R. Cruz, *Derecho de Seguros*, San Juan, Pubs. JTS, 1999, Sec. 20.3, págs. 237-238. No es hasta que la aseguradora evalúa todos estos aspectos, que se encuentra en posición para resolver una reclamación de forma final.

Se ha reconocido que una reclamación puede ser resuelta de forma definitiva de las siguientes maneras: (1) emitiendo el pago total de la reclamación; (2) expresando la denegatoria escrita y fundamentada de la reclamación; o (3) mediante la notificación de una oferta razonable que no es otra cosa que el estimado de los daños que hace la aseguradora. *Carpets & Rugs v. Tropical Reps*, supra, pág. 634. Si la aseguradora elige cumplir con su obligación mediante el envío de una oferta razonable, la oferta constituye el estimado de la aseguradora sobre los daños sufridos por la persona asegurada. Por tanto, la aseguradora está notificando que, después de una investigación diligente, un análisis de los hechos que dieron lugar a la pérdida, un examen de la póliza y sus exclusiones, así como un estudio realizado por la persona ajustadora de reclamaciones de la aseguradora, concluyó que la póliza cubre los daños reclamados en las cantidades incluidas en la comunicación. *Íd.*, pág. 635.

Cónsono con lo anterior, la aseguradora no puede retractarse del ajuste que la ley la obligó a enviar a su asegurada. Únicamente se permiten excepciones, cuando la persona reclamante actúa fraudulentamente o existen circunstancias extraordinarias que la aseguradora no pudo descubrir, a pesar de que realizó una investigación diligente.

Como cualquier otro contrato, el contrato de seguro constituye la ley entre las partes. *López Castro v. Atlantic Southern Ins. Co.*, 158 DPR 562, 568 (2003); *Monteagudo Pérez v. ELA*, 172 DPR 12, 20 (2007); Art. 1045 del Código Civil de Puerto Rico de 1930, 31 LPRA ant. sec. 2995. Es sabido que la póliza es el documento en el que se exponen por escrito los términos que rigen el contrato de seguro. Art. 11.140 del Código de Seguros,

26 LPRA sec. 1114(1). Véase, además, *W.M.M. y otros v. Puerto Rico Christian School, Inc. y otros*, supra.

Para interpretar esas cláusulas y el contrato de seguros en general, el Artículo 11.250 del Código de Seguros de Puerto Rico expone lo siguiente:

> Todo contrato de seguro deberá interpretarse globalmente, a base del conjunto total de sus términos y condiciones, según se expresen en la póliza y según se hayan ampliado, extendido, o modificado por aditamento, endoso o solicitud adherido a la póliza y que forme parte de ésta. 26 LPRA sec. 1125.

Igualmente, el Tribunal Supremo de Puerto Rico adoptó como regla general la interpretación liberal a favor de la persona asegurada en este tipo de contrato. *Aparicio v. Asoc. de Maestros*, 73 DPR 596 (1952). En *Quiñones López* v. *Manzano Pozas*, 141 DPR 139, 155 (1996), nuestro más Alto Foro explicó este principio de la siguiente forma:

> [E]n caso de dudas en la interpretación de una póliza, ésta debe resolverse de modo que se realice el propósito de la misma: proveer protección al asegurado. Es por eso que no se favorecerán las interpretaciones sutiles que le permitan a las compañías aseguradoras evadir su responsabilidad. Corresponde a los tribunales buscar el sentido y significado que a las palabras de la póliza en controversia le daría una persona normal de inteligencia promedio que fuese a comprar la misma.

De igual manera, el Foro de última instancia ha reiterado que "'[l]os términos de los contratos de seguro se rigen por las normas de interpretación aplicables a los contratos en general'". *W.M.M. y otros v. Puerto Rico Christian School, Inc. y otros*, supra. (Citas omitidas). Así pues, los términos de las pólizas de seguro deben ser generalmente entendidos en su más corriente y usual significado, sin atender demasiado al rigor gramatical, sino al uso general y popular de las voces. *Morales Garay v. Roldán Coss*, 110 DPR 701, 707 (1981). Véase, además, Art. 15 del Código Civil, 31 LPRA ant. sec. 15. De esta manera, la persona asegurada que adquiere una póliza tiene derecho a confiar en la cubierta que se le ofrece leyendo las cláusulas del contrato, a la luz del sentido popular de sus palabras. *Pagán Caraballo v. Silva, Ortiz*, 122 DPR 105, 110 (1988).

Cónsono con lo anterior, la jurisprudencia considera el contrato de seguro como uno de adhesión. Ello debido a que es la aseguradora quien redacta la póliza conforme a sus intereses sin la intervención directa de la persona asegurada. *Quiñones López v. Manzano Pozas*, supra. En vista de la naturaleza de este tipo de contrato, la aseguradora tiene la obligación de establecer en la póliza, de forma clara, los riesgos por los que está obligada a responder. *Meléndez Piñero v. Levitt Sons of P.R.,* 129 DPR 521, 547 (1991). Al ser el contrato de seguro uno de adhesión, si sus cláusulas están libres de ambigüedad y son claras en cuanto a su significado y alcance, serán obligatorias y constituirán ley entre las partes. *S.L.G. Francis-Acevedo v. SIMED*, 176 DPR 372, 387 (2009); *TOLIC v. Febles Gordián*, 170 DPR 804, 812 (2007).

De igual forma, el Artículo 11.140 del Código de Seguros de Puerto Rico, 26 LPRA sec. 1114, dispone que la póliza es el instrumento donde se deja por escrito un contrato de seguros y se articulan los riesgos que cubre el seguro, las exclusiones y todas las condiciones de este. Al determinar cuáles son los riesgos cubiertos por una póliza de seguro, es necesario considerar si en el contrato figura alguna cláusula de exclusión. *Echandi Otero v. Stewart Title*, 174 DPR 355 (2008). Estas cláusulas tienen el propósito de limitar la cubierta establecida en el acuerdo principal y disponen que la aseguradora no responderá por determinados eventos, riesgos o peligros. *Monteagudo Pérez v. E.L.A.*, supra, pág. 21. Sin embargo, el Tribunal Supremo de Puerto Rico ha expresado que estas cláusulas deben interpretarse restrictivamente, por lo que cualquier ambigüedad debe resolverse a favor de la persona asegurada. De este modo, "se cumple con el propósito de todo contrato de seguro, esto es, ofrecer una mayor protección a la persona asegurada". *S.L.G. Francis-Acevedo v. SIMED*, supra, pág. 388.

No obstante, este principio de interpretación no tiene el efecto de obligar a los tribunales a decidir a favor del asegurado una cláusula que claramente le da la razón a la aseguradora cuando su significado y alcance

sea claro y libre de ambigüedad. *López v. Atlantic Southern Ins. Co.*, supra, pág. 569.

Así pues, "cuando los términos, condiciones y exclusiones de un contrato de seguros son claros y específicos, deben hacerse valer los mismos de acuerdo con la voluntad de las partes contratantes". *Díaz Ayala v. ELA*, 153 DPR 675, 691 (2001). (Citas omitidas). Por tanto, las cláusulas del contrato son obligatorias para las partes en ausencia de ambigüedad. *Quiñones López* v. *Manzano Pozas*, supra, pág. 156.

Esbozada la norma jurídica, procedemos a aplicarla al recurso ante nos.

**III**

En su primer señalamiento de error, SRAI esgrimió que el Tribunal de Primera Instancia erró al no declarar Ha Lugar las causas de acción en daños y perjuicios: 1) por incumplimiento de contrato; 2) por mala fe y dolo en el cumplimiento de un contrato de seguros; y, 3) por no ordenar el pago de costas y honorarios por temeridad.

Por otro lado, en su segundo señalamiento de error, SRAI planteó que el foro primario erró al: no reconocer que Universal incumplió el contrato de seguros, luego de haber creado una expectativa razonable en su asegurado de que la pérdida del equipo médico en cinco facilidades sería evaluada bajo el endoso *equipment breakdown,* al permitirle negarse a cubrir los daños del MRI en la facilidad de Carolina; y, al utilizar definiciones distintas del *blanket* dentro de una misma póliza e interpretaciones restrictivas a fin de justificar el negar cubierta al equipo médico que se encontraba en propiedad asegurada.

Por estar íntimamente relacionados, procederemos a atender ambos errores de forma conjunta. SRAI arguye que el foro primario erró al no conceder una partida en daños en la Sentencia Parcial apelada. Luego de hacer un estudio exhaustivo del expediente, colegimos que el caso de autos no ameritaba una concesión de daños a favor de la SRAI. El equipo de MRI localizado en la facilidad de Carolina no estaba cubierto por la

póliza. Por lo tanto, no había daño alguno que compensar al respecto. De igual forma, y como argumentó Universal en su alegato en oposición, al agotarse el límite de pérdidas económicas a menos de 90 días de instar el reclamo, no había daño alguno que compensar al respecto.

Por otro lado, al evaluar si procedía una partida de daños por incumplimiento contractual en torno al resto de las localidades donde las partes no se han podido poner de acuerdo en el ajuste, el foro apelado dispuso que aun no procedía emitir esa determinación. No obstante, SRAI nos solicita que adjudiquemos ese asunto. Como bien esboza Universal, la solicitud de daños por alegado incumplimiento de contrato, mala fe, dolo y temeridad es prematura ya que el foro primario no ha pasado juicio sobre si la parte apelante tiene derecho a alguno de esos remedios. No podemos adjudicar sobre un asunto sobre el cual el foro primario no ha emitido una determinación final.

Por otra parte, en cuanto a la exclusión de la facilidad de MRI localizada en Carolina, concurrimos con la determinación hecha por el foro de instancia al respecto. Las dos cubiertas de la póliza que tenían relación con la reclamación de daños a la propiedad, particularmente con los equipos de MRI, eran parte de la cubierta de *Commercial Property and Commercial Inland Marine.* De la póliza no se desprende una cubierta para los daños que SRAI reclamó respecto al equipo de MRI ubicado en la localidad de Carolina. Del mismo modo, la cubierta de seguro para *Business Personal Property*, la cual forma parte de la sección de *Commercial Property* de la póliza, cubría equipo y máquinas que estuviesen en alguno de los seis (6) locales ubicados en los pueblos de San Juan, Humacao y Fajardo. Las disposiciones del contrato de seguro no incluían el equipo de MRI ubicado en la oficina de Carolina a la fecha del Huracán María. De igual forma, a pesar de que la cubierta de *Commercial Inland Marine* de la póliza, bajo la forma de *Physicians and Surgeons Equipment Coverage Form*, se extendía a la oficina de SRAI de Carolina, el riesgo que ocasionó los daños al equipo de MRI ubicado allí, y

consecuentemente las pérdidas asociadas, estaba expresamente excluido de la póliza. La exclusión del *Physicians and Surgeons Equipment Coverage Form* establecía claramente que eximía de la cubierta todo daño causado a cualquier equipo por cualquier disturbio en la energía eléctrica generada artificialmente que afecte cualquier equipo eléctrico. Como correctamente dispuso el foro de instancia, esta cláusula limitaba y reducía la cubierta para el equipo de MRI bajo la sección de *Commercial Inland Marine* de la póliza cuando el daño fuese causado por problemas en la corriente eléctrica generada artificialmente. Por todo lo antes expuesto, no apreciamos ningún error en la interpretación hecha por el foro primario de las disposiciones de la póliza.

En su segundo señalamiento de error, SRAI arguye que toda limitación en la cubierta de la póliza se debe entender renunciada como resultado del informe parcial que emitieron los ajustadores de Universal. No obstante, como correctamente determinó el Tribunal de Primera Instancia, no existe evidencia que sustente una renuncia o impedimento respecto a alguna disposición de la póliza. Sobre el informe, el foro primario estableció, como hecho incontrovertido, que a petición de SRAI se había procedido a liquidar las pérdidas asociadas a la interrupción de negocios y gastos extras, dejando para más adelante el análisis de las pérdidas materiales de los contenidos y los equipos médicos. Las pérdidas materiales serían analizadas bajo la cobertura de *Equipment Breakdown*. Con este hecho queda evidenciado que el análisis futuro que harán los ajustadores de Universal no es sinónimo de la existencia de una cubierta.

Previo a que se presentara ante Universal un análisis técnico para establecer la causa de los daños al equipo de MRI de Carolina, Universal, a solitud de SRAI, había otorgado una partida por la pérdida de ingresos. Del informe parcial de los ajustadores de Universal, se desprendió que las pérdidas de ingresos eran para las localidades de San Juan y Humacao, ya que por sí solas, excedían el límite contractual de $500,000.00. Por esto, no hubo que entrar a considerar ni aplicar asuntos de cubierta en torno al

local de Carolina para efectos de la pérdida reclamada por concepto de ingresos del negocio y gastos adicionales. Este hecho fue establecido en la Sentencia Parcial del foro de instancia.

Por lo antes expuesto, no es correcto determinar que el pago de *Business Income & Extra Expense* incluía Carolina. Del mismo modo, no existe fundamento que le atribuya a Universal una renuncia o impedimento respecto a su determinación de cubierta. No existe controversia en que, cuando el equipo del MRI localizado en Carolina fue añadido a la reclamación en la presentación del análisis técnico el 13 de noviembre de 2018, Universal hizo el análisis al que se había comprometido e inmediatamente denegó la cubierta, explicando las razones para ello.

Es un hecho incontrovertido que Universal cursó una oferta de pago final por la cuantía de $500,000.00, que era el límite de responsabilidad de la póliza bajo la cubierta de *Business Income & Extra Expense,* y que la misma no estableció una indemnización por local, sino por el límite de responsabilidad de la póliza. Por lo tanto, cuando se hizo el pago del límite contractual para *Business Income,* no se le notificó a SRAI que se había hecho un ajuste de la reclamación bajo las cubiertas de propiedad para el equipo de Carolina. Concurrimos con el argumento de Universal que estos hechos no configuran un retracto por parte de la aseguradora, sino que, al contrario, evidencian que Universal pagó el límite de la cubierta, y pospuso el análisis de la reclamación de daños a los equipos médicos a petición de SRAI. Determinar cualquier otra cosa, tendría el efecto de ir en contra del contrato entre las partes a través de la póliza e iría en exceso del límite contractual establecido en la póliza para pérdidas de ingresos por interrupción de negocios.

En el caso de autos, la responsabilidad de Universal se encuentra claramente establecida en la póliza de seguros. Dado a que las disposiciones de la póliza claramente excluyen de la cubierta los daños al equipo del MRI de la localidad de Carolina, Universal no tiene obligación alguna ante SRAI de indemnizar por los daños sobre ese equipo o cualquier

otro equipo resultante. Por lo antes expuesto, colegimos en que no le asiste la razón a SRAI en su primer y segundo señalamiento de error.

Por otro lado, en su tercer y último señalamiento de error, SRAI esbozó que erró el Tribunal de Primera Instancia al usurpar funciones legislativas interpretando el Código de Seguros de forma contraria a su intención y dejando que la aseguradora negara reclamaciones fuera del término establecido por ley. No le asiste la razón. Veamos.

Sobre este error, le asiste la razón a Universal cuando establece que el mismo pretende cuestionar y revertir una determinación que advino final y firme mediante la *Sentencia Parcial* del foro primario el 28 de agosto de 2020. Esto queda evidenciado cuando SRAI cuestiona la negativa del foro primario a penalizar a la aseguradora esencialmente por haber negado la reclamación fuera del término de 90 días que dispone el Artículo 27.162 del Código de Seguros, 25 LPRA sección 2716 (b). Es bajo el Artículo 27.164 del Código de Seguros que una persona puede solicitar un remedio en daños por incumplimiento con el Artículo 27.162. En su momento, SRAI no solicitó una reconsideración en cuanto a la determinación del foro primario, por lo tanto, la decisión del foro primario advino final y firme. Por todo lo anterior, concluimos que no se cometió el tercer señalamiento de error.

**IV**

Por los fundamentos que anteceden, confirmamos la determinación apelada.

Lo acordó y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones